**Susan FERRARO, Plaintiff,**

v.

**BELL ATLANTIC COMPANY, INC., Frank Jahnke, Bruce Pierson, Daniel Galbraith et. al., Defendants.**

**Civil Action No. 96–6111.**

United States District Court,
D. New Jersey.

April 7, 1998.

Law Offices of Linda B. Kenney by Steven P. Monaghan, Red Bank, NJ, for Plaintiff.

Carpenter, Bennett & Morrisey by Francis X. Dee, David J. Reilly, Pamela Davis–Clarke, Newark, NJ, for Defendants Bell Atlantic Co., Inc., Frank Jahnke and Bruce Pierson.

Collier, Jacob & Mills by Rosemary S. Gousman, Somerset, NJ, for Defendant Daniel Galbraith.

## OPINION

IRENAS, District Judge.

This matter appears before the Court upon the motions for summary judgment of the defendants. Defendants Bell Atlantic Company, Inc. of New Jersey ("Bell Atlantic"), Frank Jahnke ("Jahnke"), and Bruce Pierson ("Pierson") move for summary judgment on Counts One, Two, and Three of plaintiff Susan Ferraro's ("Ferraro") complaint. Defendant Daniel Galbraith ("Galbraith"), having previously had Counts One, Two, and Three dismissed as to him, moves for summary judgment on Count Four, which is directed solely against him. Bell Atlantic further moves for summary judgment on Counts Five and Six of plaintiff's complaint, which are directed solely against it. We will grant summary judgment to Bell Atlantic on Counts Three, Five and Six. We will also grant summary judgment to Pierson and Jahnke on all claims against them and dismiss them from the case. Summary judg-ment will be granted to Galbraith on plaintiff's one remaining claim against him and he will also be dismissed form the case. Counts One and Two against Bell Atlantic survive summary judgment and remain for decision at trial. Count Seven, recently added, also remains.

## I. BACKGROUND

Plaintiff began working at Bell Atlantic in the coin box division on December 30, 1974. She moved to the radio/video department as a systems technician several years later. Plaintiff's job duties in the radio/video department included maintaining and installing phones and maintenance radios, servicing point to point microwaves, temporary microwaves and base station microwaves, and servicing remote receivers. Plaintiff originally began working at the radio/video group at Bell Atlantic's Metuchen, New Jersey facility. Her group was subsequently reassigned to the Woodbridge facility. Besides plaintiff, no other female has worked in the Woodbridge radio/video group since 1972. Throughout her tenure at Bell Atlantic, the terms and conditions of plaintiff's employment have been governed by the collective bargaining agreement between Bell Atlantic and Local 827 of the International Brotherhood of Electrical Workers ("Union").

Plaintiff and defendant Galbraith, a fellow radio/video systems technician, began working together at the Metuchen facility in October 1983. They both then moved to the Woodbridge facility together. The technicians in plaintiff's group reported to the Woodbridge facility each morning at 8:00 a.m. They were then dispatched to assignments at various field locations by defendant Pierson, plaintiff and the other technicians' immediate supervisor. Pierson also had field responsibilities which required him to spend time away from the Woodbridge office. In the latter part of 1991, Pierson moved from the Woodbridge facility to another Bell Atlantic facility in Trenton. Despite the geographical move, Pierson remained in charge of the Woodbridge radio/video group. Instead of reporting in person each morning, he would call in at 8:00 a.m. to dispatch the technicians to their respective assignments.

For the greater part of their time as co-employees, plaintiff and Galbraith appeared to get along. In her deposition, plaintiff acknowledges that she and Galbraith had a "very good" working relationship, and that Galbraith was "very instructive, helpful, informative, patient and cooperative." Ferraro Dep. at 56. She states he "[t]aught [her] a lot. Was patient, informative." *Id.* at 56.

In October, 1992, plaintiff began to perceive a change in her male co-employees treatment of her. In particular, she felt that Galbraith became reclusive, uncooperative, uncommunicative and moody towards her. Plaintiff testified that she does not know what precipitated the change in Galbraith's treatment of and attitude towards her. Ferraro Dep. at 249. Galbraith contends that he altered his behavior and began avoiding plaintiff in October 1992 because her attitude appeared to be changing, because she was arguing on the phone with her family members, and because she was "loud and boisterous." Galbraith Dep. at 126. At around this same time, plaintiff claims that her coworkers (all males), Galbraith, Skip Landt and Rick Werner, "began to wage a campaign to deliberately alienate, isolate and abuse [plaintiff] in the workplace." Pl.Br. at 2.

Plaintiff claims that the abuse began as her male co-employees started to be uncooperative with her. They stopped giving her telephone messages. They stopped speaking with her. One by one, they moved their work stations from the shop where they had all once worked into another room, ultimately leaving plaintiff all alone. Galbraith and Landt both began to ignore her, interacting with other workers, but not with her. In short, plaintiff perceived she was being alienated.

Around June 7, 1993, plaintiff first approached her supervisor Pierson about Galbraith's conduct. She told him she was experiencing problems with her co-workers and needed him to intervene. She explained her feelings of alienation. At this time, Pierson had moved to Trenton and, although he phoned in daily, visited the Woodbridge facility in person only once a month. Plaintiff requested an on-site supervisor to alleviate the problems. Pierson was "understanding to a point," but told her that he could not be a "babysitter" and that she should resolve these problems herself.

Plaintiff alleges that sometime in 1993, the other technicians began to become overtly abusive to her. In particular, she claims Galbraith called her a "bitch" on at least three separate instances. Galbraith admits in his deposition that he called plaintiff a "bitch" on at least one occasion and may "possibly" have called her that pejorative name on other occasions. Galbraith Dep. at 137. He also admits that he used the term "bitch" when referring to plaintiff in conversations with other co-workers. *Id.*

The first of the instances in which Galbraith called plaintiff a "bitch" occurred in the shop at the Woodbridge facility on an unspecified date in 1993. Galbraith allegedly walked away from her, called her a "bitch" and muttered "bitch, bitch, bitch." On September 17, 1993, plaintiff spoke with Galbraith in an attempt to address their problems. She allegedly asked him whether they could work it out, and what it was she had done to receive such treatment. Plaintiff informed Pierson about this incident on November 22, 1993. She alleges she told him "Bruce, you know, Danny is now calling me names. I can't work under these conditions." Ferraro Dep. at 120. Plaintiff does not recall, however, whether she told Pierson during this conversation that Galbraith had specifically used the term "bitch" to her. She does recall that she was crying and very upset. Pierson testified that, after speaking with plaintiff about her complaints, he did not think there "was anything serious going on." Pierson Dep. at 49. He suggested to plaintiff that "the workers work it out amongst themselves." *Id.* at 58. He acknowledges that she was "a bit upset" and may have cried.

On another instance, sometime in 1994, Galbraith allegedly called plaintiff a "bitch" outside the facility garage. Plaintiff believes she may "offhandedly" have mentioned this incident to Pierson, although she cannot recall any precise date. Her day planner indicates that she spoke to Pierson on February 8, 1994, April 14, 1994 and June 15, 1994. She claims she repeatedly asked Pierson for intervention and for the help of a supervisor.

Plaintiff alleges that in 1994 her alienation escalated. She claims the tension with Galbraith increased. He persistently refused to talk to her and was quite adamant that he wanted nothing to do with her. Plaintiff also began to fear Galbraith. She claims she was aware that he had tendencies to become violent; she believed he had once attacked a former supervisor and co-worker, had once picked someone up by the shirt collar and pushed him through a glass bulletin board, and had been arrested for throwing a cash register at a computer store. She personally observed Galbraith slamming telephones or doors at the Woodbridge facility when he was upset.

The third, and most violent episode during which Galbraith called plaintiff a "bitch" occurred on November 7, 1994. Pierson had called a meeting, in response to plaintiff's complaints, to address certain difficulties between the members of the group, particularly a problem that had arisen over the assignment of overtime. In attendance were plaintiff, Galbraith, Skip Landt and Rick Werner. Pierson opened the meeting by acknowledging that there were problems in the group, and by telling the group that he wanted to know what the problems were. Landt began by stating that plaintiff had no business creating problems with overtime. In Landt's opinion, the issue was job continuity; if an employee began a job, that employee should be assigned any overtime necessary to complete it. Plaintiff responded that a dispute between another employee and herself did not involve him, and told Landt that overtime is assigned pursuant to the overtime list. She believed that because she was higher on the overtime list, she was entitled to the overtime.

According to plaintiff, after she made these remarks, Galbraith "went ballistic" and "flew out of his chair screaming that she was a bitch and that she did not do anything in the shop, that she had crap all over the place, and that she did nothing all day long." Ferraro Dep. at 150. Galbraith told plaintiff he had deliberately been ignoring her for over a year. He pointed his finger at her face, screamed that she did not do a "fucking thing" and said that he was tired of getting all the "shit work." Id. at 154. He then announced that he was not going to deal with

this crap and that he was going home sick. Finally, Galbraith stormed out of the shop and slammed the door. He did not return to work for a week.

A few hours after the meeting, plaintiff began to shake uncontrollably. Plaintiff told Pierson that Galbraith physically intimidated her in a threatening manner and asked him what he was going to do to help alleviate the situation. She asked him what he was going to do when Galbraith returned to the shop and the two would have to work together again. Pierson promised plaintiff that she would get the supervision necessary.

Plaintiff names Galbraith as the co-worker she most considered "hostile." Ferraro Dep. at 291. Nonetheless, the record shows that she also had difficulties with Landt. She contends that "Landt treated [her] in a sexist manner"· and that he "did not like to work with [her]." Id. at 425. As examples of Landt's unfriendly attitude and unequal treatment of her, she cites an occasion when Landt asked her two co-workers, but not her, for a phone number, and another occasion when he asked her two co-workers, but not her, a technical question. Plaintiff also asserts that Landt "didn't think much of women," "spoke in a manner degrading to women," and acted "in a macho manner." Id. at 425. She claims Landt "was very much into guns and hunting, and he was very much involved with the NRA, and he was very verbal about issues on the NRA, and there were just times he was having discussions with the guns that [she] would just definitely be frightened of him," because Landt read Solider of Fortune magazine, and because she did not like the way that Landt spoke to his wife on the phone. Id. at 426–33.

Plaintiff alleges that the hostility by the other male technicians had a direct result on the training and overtime that she was able to receive at Bell Atlantic. Because Bell Atlantic had no formal procedure for on-the-job training and there were no formal guidelines for job training, technicians received necessary training and education informally, from the other technicians. Plaintiff claims that on one occasion she discovered a group taking a class in the shop. She admits that nobody told her she could not participate and

stated that she "felt relieved" that she did not have to interact with the men in the class. Ferraro Dep. at 445–48. Pierson admits that one of plaintiff's complaints to him was that the male technicians were not sharing with her the knowledge they gained on the job. Pierson Dep. at 71. Pierson testified in his deposition that the male technicians' practice of avoiding plaintiff partially compromised her ability to receive on-the-job training. *Id.* at 76. However, notes from an EEO investigation undertaken by Bell Atlantic demonstrate that, of the four technicians in her group, plaintiff received the most training in 1993 and the second most training in 1994. Exh. M to Monaghan Supp. Cert.; Training Records Bates Stamped 000309–000312, Exh. A to Mosley Aff.

Receiving on-the-job training had a direct impact on the amount of overtime a technician would receive. Pierson testified that most of the overtime on jobs was "pretty much worked out" amongst the technicians. Pierson Dep. at 67. One factor that the technicians relied upon in determining overtime was which technician was the "low person"—the one with the least amount of overtime. Another factor relied upon was a technician's knowledge of equipment. Ultimately it was Pierson's job to award the overtime. Pierson recalls specific occasions when plaintiff lacked the necessary knowledge to receive overtime. Pierson Dep. at 72. On one occasion, which, because of plaintiff's complaints to Pierson, prompted the November 7, 1994 incident with Galbraith, plaintiff was denied overtime despite the fact that she was the "low person." Pierson claims another technician, Rick Werner, was upset at the prospect of plaintiff receiving this overtime. Nonetheless, plaintiff admits that Pierson told Werner that the overtime would have to go to plaintiff. Ultimately, the overtime went to Werner, not plaintiff. Pierson states that this decision was made in part because plaintiff lacked the necessary knowledge of the equipment needing service. Pierson Dep. at 86. Plaintiff admits that the decision to give Werner the overtime may also have been made in part because, after initially complaining about not being offered the overtime, she told Pierson that Werner could have the overtime after all. Ferraro Dep. at 140–41.

Pierson reported a problem with the members of the radio/video group to his supervisor, defendant Jahnke, on November 7, 1994, immediately after Galbraith's outburst. Prior to this, he had not mentioned any of plaintiff's complaints to Jahnke. Pierson told Jahnke that Galbraith had called plaintiff a "bitch" and had then walked out of the room. Jahnke then stated that he wanted to talk to both plaintiff and Galbraith. Pierson informed him that Galbraith had gone home and plaintiff was at the garage. Jahnke never contacted plaintiff thereafter. On November 9, 1994, plaintiff reported her complaints to Homer Mosley ("Mosley"), the Manager EEO Complaints/Counselor for Bell Atlantic. In a facsimile to Mosley, plaintiff explained that:

> Over the past year and a half I have been experiencing a slow but deliberate division amongst my immediate co-workers. I have been isolated and ignored to the point of physical separation within my own reporting location. This has been progressing since the absence of supervisor presence.... I have repeatedly requested my supervisor to intervene on my behalf but to no avail. His reply regarding the matter has always been the same, we should work this out amongst ourselves and that he is not a baby-sitter.

Exh. K to Monaghan Certif. Plaintiff also outlined the details of Galbraith's violent outburst at the November 7, 1994 meeting. *Id.* She indicated that the "alienation caused by the harassment has hindered my exclusion of certain job concerning assignments and excluded me from equal opportunity to participate in overtime due to job opportunity." *Id.* She stated "I am the only female in the craft ... I am made to feel as though I am an outsider, inferior and incompetent, neither of which is the case." *Id.*

Mosley's understanding of the initial complaint was "that Susan Ferraro was stating that she was being treated differently as a result of her sex." Mosley Dep. at 87. Nonetheless, he apparently did not ask anyone during his investigation whether plaintiff's treatment by her co-employees was motivated by her gender. Mosley also did not investigate her claim of being alienated. He

claimed he did not have the impression that plaintiff was isolated and ignored to the point of physical separation. He also did not appear to consider the effects the alleged alienation might have on her ability to receive on-the-job training from co-workers.

On November 10, 1994, Mosley conferred with Pierson, who corroborated plaintiff's account of the November 7, 1994 meeting and Galbraith's violent outburst. Mosley questioned Pierson about plaintiff's characterization of Galbraith as irrational and explosive. Pierson admitted there had been an incident where Galbraith had actually yelled at him. Exh. K to Monaghan Certif. at 339. Mosley told Pierson to "be alert to workplace violence." Exh. K at 340. Neither Pierson nor another supervisor was placed in the Woodbridge facility to oversee the group.

On November 15, 1994, a day after Galbraith had returned to work, Jahnke met with plaintiff. Plaintiff explained her concerns and described the problems she was experiencing. She told him that being the only female, she felt threatened, frightened and intimidated, in particular of Galbraith. She told Jahnke that if he could not provide a supervisor, she wanted a transfer to the conduit department, which was a lateral transfer allowing her to continue in the position of systems technician and affording her the opportunity to work with both a supervisor and another female. Plaintiff also suggested a transfer to a position in the fiber optics group. She made it clear that she did not want to remain in the radio/video group without a supervisor. Jahnke told plaintiff that he was going to ask Galbraith to apologize to her.

Jahnke spoke with Galbraith. Galbraith explained that he had not spoken with plaintiff for the past several months, and admitted calling her a bitch. Jahnke testified that Galbraith may have told him other members of the group may also have been avoiding plaintiff. Jahnke asked Galbraith to apologize and told him if he did not apologize he would be given a letter of reprimand. Galbraith told him he was not going to apologize.

Jahnke never discussed with Pierson the possibility of having him report more often to the Woodbridge facility, even on a temporary basis. Jahnke did not believe it was necessary to have an in-person supervisor for the radio/video group. Nonetheless, several options were considered to resolve the situation between plaintiff and Galbraith. Pierson raised the possibility of transferring Galbraith to another location, but plaintiff objected to this solution which she believed would constitute a reward to Galbraith. Ferraro Dep. at 372–73. Plaintiff was also offered the possibility of reporting to a location close to her home, but she rejected this option because she "didn't understand how [she] would do [her] work from a remote location." *Id.* at 339–40.

On November 21, plaintiff became sick. She went on disability on November 28, 1994. Plaintiff alleges that she began to experience chronic pains, undisclosed pain, loss of concentration, loss of confidence, loss of self-esteem, loss of security, loss of trust, severe chronic headaches, severe chronic backaches, and impaired vision.

Dr. Lawrence Katz had been treating plaintiff since April, 1988. Prior to 1994, Dr. Katz found plaintiff to be in good health, with no evidence an underlying anxiety disorder. Dr. Katz referred plaintiff to Dr. Kenneth Rubin, a psychiatrist, who initially diagnosed plaintiff with an adjustment disorder. Plaintiff told Dr. Rubin about her problems with her male co-workers and her feelings of alienation. Dr. Rubin opined that the precipitating factor for plaintiff's psychiatric condition has been her work environment, including the lack of supervision. He specifically noted her isolation, her failure to get messages from co-workers, and the angry outbursts as causal factors for the condition.

After plaintiff left on disability, Mosley made a "no cause" determination on plaintiff's complaint. While she was on disability, she was again offered the option to transfer to another location, but she declined. No other efforts were made to remedy the situation. Plaintiff alleges that Bell Atlantic also lacked a good sexual harassment policy. She claims that the instructions to its employees on the sexual harassment policy and the formal and informal complaint structures were wholly inadequate. The employees were given a copy of the Code of Conduct annually and were asked if they had any questions

about it. If there were no questions, the supervisors would not review the Code of Conduct. No specific discrimination training was offered for either employees or supervisors. The Code of Conduct told employees to discuss their complaints with their immediate supervisor. Pierson stated that in a clear case of sexual harassment he was told to refer it to EEO, but that he was given no guidelines from which to evaluate sexual harassment claims.

Pursuant to the Bell Atlantic Sickness Accident and Disability Benefits Policy ("SADBP"), the amount of sickness disability benefits an eligible employee receives depends upon the employee's base pay, the number of hours they are regularly scheduled to work and their net credited service as of the eighth calendar day of their absence. SADBP at 3, Exh. A to Agrusti Aff. As of November 29, 1994—the eighth calendar day of her absence—plaintiff had 19 years of service with Bell Atlantic. Ferraro Dep. at 451–56. Although plaintiff thinks she was told she would receive her 20 year pin (which she did not), she admits that her 20th year with Bell Atlantic would not have begun until January 1, 1994.[1] Id. at 452. Pursuant to the terms of the SADBP, employees with 15 to 20 years of service, as of the eighth calendar day of their absence, are not entitled to more than 26 weeks of disability leave at full pay. SADBP at 4, Exh. A to Agrusti Aff.

Plaintiff instituted this action by filing her complaint in the Superior Court of New Jersey, on November 6, 1996. On December 27, 1996, defendants removed plaintiff's complaint to federal court. Plaintiff's claims are as follows:

Count One: Defendants discriminated against her because of gender, in violation of the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5–1 et seq.;

Count Two: Defendants failed to take action in response to her complaints of a sexually hostile work environment, in violation of the NJLAD;

Count Three: Defendants retaliated against her for making a complaint of a hostile work environment, in violation of the NJLAD;

Count Four: Defendant Galbraith's actions constituted the tort of intentional infliction of emotional distress;

Count Five: Defendant Bell Atlantic breached an express and/or implied contract to pay her for accrued vacation time; and

Count Six: Defendant Bell Atlantic breached the terms of Bell Atlantic's short term disability ("STD") policy and denied her a wage increase.[2]

On March 31, 1998, plaintiff added an additional court in her amended complaint:

Count Seven: Defendants Bell Atlantic, Metropolitan Life Insurance and/or Mutual of Omaha Life Insurance Company, and Bell Atlantic Corporation denied her long term disability ("LTD") benefits in violation of the terms of Bell Atlantic's LTD policy.

By Order and Memorandum Opinion entered on September 4, 1997, the Honorable Garrett E. Brown, Jr. entered partial summary judgment in favor of defendant Galbraith and dismissed Counts One, Two, and Three of plaintiff's complaint with prejudice as to Galbraith, relying on this court's opinion in *Tyson v. CIGNA Corp.*, 918 F.Supp. 836 (D.N.J.1996). On October 16, 1997, the case was transferred to this courthouse and is now before this Court.

## II. DISCUSSION

### A. *Individual Liability Under NJLAD*

■■■ In *Tyson v. CIGNA*, 918 F.Supp. 836 (D.N.J.1996) (Irenas, J.), this Court undertook an extensive analysis of the extent to which individual liability is imposed under

1. Plaintiff claims that her length of service with the company was affected by Bell Atlantic's failure to provide her with accrued vacation time for 1995 or unused vacation time from 1994. However, she points to absolutely no evidence supporting her view that Bell Atlantic's SADBP policy required the company to consider accrued or unused vacation time for purposes of determining net credited service time and there is nothing in the policy itself which states that vacation time

is considered. The policy is very clear that net credited service time is computed solely on the status of an employee's time with the company as of the eighth day of their absence.

2. Count Six also alleged that Bell Atlantic denied plaintiff LTD benefits. Since this claim has now been stated in greater detail in the new Count Seven, we will address it in Count Seven only.

the NJLAD. We will not resurvey the legal territory here, but instead refer the reader to *Tyson* for a detailed presentation of our understanding of individual liability under the NJLAD. Briefly, we held in *Tyson* that the NJLAD "imposes liability on supervisory employees only to the extent that the supervisory employee affirmatively engages in discriminatory conduct while acting in the scope of employment. A supervisory employee's omissions, acquiescence, passivity or other failure to act will not support a claim under the NJLAD." *Id.* at 837. As Pierson and Jahnke both worked for Bell Atlantic as plaintiff's supervisors, this Court must address the level of each's affirmative engagement in the alleged sexual discrimination of plaintiff.

Plaintiff alleges that Pierson and Jahnke knew of the alleged sexual harassment but did nothing to remedy the situation. In particular, she notes that she made complaints to both Pierson and Jahnke about Galbraith's treatment of her and yet nothing was done. She also claims that she informed both Pierson and Jahnke of the fact that she was not receiving the proper on-the-job training she required and therefore was losing overtime hours. As *Tyson* makes clear, these facts without more do not rise to the level of affirmative engagement required for individual liability. *See Tyson*, 918 F.Supp. at 841 (holding that "[m]ere inaction, passivity, or acquiescence" fall short of the "willfulness, intent, or commonality of goals" required for NJLAD "individual liability").

Furthermore, both Pierson and Jahnke did take steps to help plaintiff. After the November 7, 1994 incident with Galbraith, Pierson reported to Jahnke and informed him of the problems within the radio/video group and of Galbraith's violent remarks to plaintiff. Jahnke then asked to speak to both Galbraith and plaintiff. Neither of them were available at that time, but Jahnke eventually did speak to Galbraith and demanded that he apologize to plaintiff. He told Galbraith he would be reprimanded if he did not

apologize. Pierson offered to transfer plaintiff to another location or to have Galbraith transferred. Plaintiff rejected both options. In addition, the record demonstrates that plaintiff's concerns about overtime were addressed. Plaintiff's complaints to Pierson led to the November 7, 1994 meeting about overtime. In addition, of the four technicians in her group, plaintiff received the most training in 1993 and the second most training in 1994. Accordingly, we find that there is no evidence that Pierson or Jahnke affirmatively engaged in any discriminatory conduct with respect to plaintiff. Thus, we will grant the motion for summary judgment on plaintiff's NJLAD claims against Pierson and Jahnke in Counts One, Two and Three of her complaint.

**B.** *Analytical Framework For Evaluating Employment Discrimination Cases*

Courts analyzing employment discrimination claims under the NJLAD,[3] where, as here, the plaintiff has no direct evidence of discrimination, utilize the burden-shifting analytical framework first set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1983). *See Bray v. Marriott Hotels*, 110 F.3d 986, 997 (3d Cir.1997); *Marzano v. Computer Science Inc.*, 91 F.3d 497, 502 (3d Cir.1996); *Abrams v. Lightolier Inc.*, 50 F.3d 1204, 1212 (3d Cir.1995); *Tyson v. CIGNA Corp.*, 918 F.Supp. 836, 838–39 (D.N.J.1996); *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 626 A.2d 445 (1993); *Grigoletti v. Ortho Pharm. Corp.*, 118 N.J. 89, 570 A.2d 903 (N.J.1990); *Clowes v. Terminix International, Inc.*, 109 N.J. 575, 595, 538 A.2d 794 (1988); *Andersen v. Exxon Co.*, 89 N.J. 483, 492, 446 A.2d 486 (1982); *Goodman v. London Metals Exchange Inc.*, 86 N.J. 19, 31, 429 A.2d 341 (1981); *Peper v. Princeton University Board of Trustees*, 77 N.J. 55, 82–83, 389 A.2d 465 (1978). Thus, in analyzing plaintiff's NJLAD claims in Counts One and Three, we must use the McDonnell Douglas framework.[4]

---

**3.** The NJLAD states that: "All persons shall have the opportunity to obtain employment ... without discrimination because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status." N.J.S.A. § 10:5-4.

**4.** As demonstrated *infra* at Part II.E, analysis of plaintiff's hostile work environment claim under the NJLAD has its own separate elements and does not require the burden shifting analysis of *McDonnell Douglas*.

The *McDonnell Douglas* analysis, often referred to as a "pretext" theory, was developed to address the difficulty in obtaining direct evidence of discrimination. *See Sheridan v. E.I. DuPont de Nemours and Co.,* 100 F.3d 1061, 1071 (3d Cir.1996) (en banc), *cert. denied,* —— U.S. ——, 117 S.Ct. 2532, 138 L.Ed.2d 1031 (1997). In a pretext case, a plaintiff must first make a prima facie case of discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Erickson,* 117 N.J. at 560, 569 A.2d 793. If the plaintiff succeeds in establishing these three elements, then the burden shifts to the defendant to advance a legitimate, nondiscriminatory reason for making the adverse employment decision. Once the defendant has proffered such a reason, the plaintiff must raise an issue of fact regarding whether the defendant's proffered explanation is pretextual or whether sexual discrimination was more likely than not a determinative factor in the decision. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994); *see Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 n. 2 (3d Cir.1997); *Sheridan,* 100 F.3d 1061.

■ Pretext is "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs;" in essence, pretext is a "cover-up" for a discriminatory purpose. *Loeb v. Textron,* 600 F.2d 1003, 1012 (1st Cir.1979). In order to show pretext, the plaintiff may rely upon evidence which rebuts the proffered reason, so as to allow the fact-finder to conclude that the illegal basis motivated the employer. *See Fuentes,* 32 F.3d at 764. The employee need not submit direct evidence of discrimination, but must only raise a genuine issue of fact suggesting pretext by providing some evidence establishing a reasonable inference that the employer's proffered reason for the

adverse employment decision was weak, implausible, inconsistent, incoherent or contradictory so as to be unworthy of credence. *See Fuentes,* 32 F.3d at 764–65. Summary judgment is improper if the plaintiff points to evidence which raises doubt about the employer's proffered basis, *see Geary v. Visitation of the Blessed Mary Parish School,* 7 F.3d 324, 331–32 (3d Cir.1993); the plaintiff's evidence need not necessarily lead to the conclusion that the employer did not act for the nondiscriminatory reasons. *See Sempier v. Johnson & Higgins,* 45 F.3d 724, 728 (3d Cir.1995); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 205 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988).

### C. *Count One: Sexual Discrimination Claim*

■ In order to establish a prima facie case of sexual discrimination, plaintiff must show: (1) that she is female; (2) that she applied and was qualified for a job, or other compensation, terms, conditions, or privileges of employment; (3) that, despite her qualifications, she was rejected; and (4) a male employee with similar qualifications received the job, compensation, term, conditions, or privilege. *See, e.g., Waldron v. SL Industries,* 56 F.3d 491, 494 (3d Cir.1995) (citing *McDonnell Douglas* and *Burdine* ). Here, there is a genuine issue of fact as to whether or not Bell Atlantic refused to grant plaintiff any sought-after job, compensation, term, condition or privilege for which she was qualified.[5] If it is determined that Bell Atlantic did deny plaintiff a sought-after benefit of some kind, there is also a dispute as to whether or not discrimination based on sex was more likely than not a motivating factor in the decision to deny her such benefit.

Plaintiff claims that Bell Atlantic denied her on-the-job training and overtime because of her sex. She notes that on one occasion she was not asked to be a part of a group

---

5. Although she states in her interrogatory answers that her claim under Count One is based on the precise set of facts as her claim under Count Two, *see* Exh. G to Reilly Aff., and her brief apparently treats them together, plaintiff has completely failed to address the merits of her non-hostile work environment sexual discrimina-

tion claim in her brief. This makes it difficult for the Court to determine precisely what issues of disputed fact plaintiff maintains are relevant to her claim under Count One. Nonetheless, we can glean from her brief certain facts material to Count One which demonstrate disputes that must be resolved at trial.

that was taking a class in the shop. Bell Atlantic claims that plaintiff admitted that on this occasion she watched the class for a while, and "felt relieved" that she did not have to interact with the men in the class. Bell Atlantic further alleges that nobody told plaintiff that she could not participate in the class. Plaintiff also claims that Bell Atlantic's failure to recognize the negative effect her alienation was having on her ability to get training from her colleagues denied her important on-the-job training. Bell Atlantic, to the contrary, claims that plaintiff was in fact given training, stating that she she received the most training in 1993 and the second most training in 1994. As to overtime, the parties give different versions of the events leading to the November 7, 1994 meeting and the ultimate award of the overtime there in question to Werner. Plaintiff alleges she was denied the overtime because of her lack of on-the-job training. Bell Atlantic contends that plaintiff turned down the offer of overtime after making her initial complaints about it. Because these issues of material fact are in dispute, we will deny Bell Atlantic's motion for summary judgment on Count One of plaintiff's complaint and leave the issues of denial of benefits and the reasons, if any, for the denial of such benefits for resolution at trial.

### D. *Count Three: Retaliatory Discharge*

In order to make a prima facie case of retaliatory discharge under Title VII, and thus the NJLAD, a plaintiff must show "1) that she engaged in protected activity, 2) that her employer took adverse action against her, and 3) that a causal link exists between the protected activity and employer's action." *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3d Cir.1997); *see Nelson v. Upsala College,* 51 F.3d 383, 386 (3d Cir. 1995); *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990); *Bowles v. City of Camden,* 993 F.Supp. 255 (D.N.J. 1998). Here, plaintiff has entirely failed to argue her claim of retaliation and, based in the facts on record, we cannot find that she has met the necessary elements for making a prima facie case of retaliation. Although plaintiff's actions in filing an EEO complaint are protected, she has not demonstrated that

Bell Atlantic took any adverse action against her that is causally related to her filing of the complaint. The record shows that plaintiff lodged her EEO complaint on November 9, 1994 and then became sick and decided to leave Bell Atlantic on disability on November 28, 1994. During the two week interim, Bell Atlantic investigated plaintiff's complaint and attempted to offer plaintiff a new position where she would be free from the allegedly strained atmosphere in the Woodbridge radio/video group. Under these facts, we simply can find no causal link between plaintiff's filing of a complaint with Mosley in the EEO department and any action taken by Bell Atlantic that was adverse to plaintiff. Therefore, we will grant Bell Atlantic's motion for summary judgment and dismiss Count Three of her complaint.

### E. *Count Two: Hostile Work Environment*

The New Jersey Supreme Court has held that, in order to establish a claim of hostile work environment under the NJLAD, a plaintiff must demonstrate that the complained of discriminatory conduct:

> (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a(3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive.*

*Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 603–04, 626 A.2d 445 (1993) (emphasis in original).

Here, we find that there is a genuine dispute of material fact as to all four of the necessary Lehmann elements. Plaintiff claims that the alienation and name calling she experienced would not have occurred *but for* her sex. Bell Atlantic, to the contrary, contends that the conduct complained of was not based upon her sex but was instead the result of a personality conflict that developed between her and her co-workers Galbraith and Landt. While it is true that for approximately nine years, plaintiff worked with Galbraith without any problems or difficulties, we cannot say as a matter of law that the change in Galbraith's attitude toward plaintiff was not motivated by plaintiff's gender. Neither can we determine as a matter of law whether Landt's unfriendly attitudes toward

plaintiff or the general alienation and lack of supervisor help allegedly experienced by plaintiff was motivated by a discriminatory attitude toward women.

A material issue of fact also exists as to the remaining *Lehmann* elements, whether the treatment suffered by plaintiff was severe or pervasive enough to make a reasonable woman believe that the conditions of employment are altered and the working environment is hostile or abusive. We feel that only the ultimate fact finder in this case can determine whether a hostile work environment existed at Bell Atlantic. A fact finder may believe that Galbraith's name calling, Galbraith's violent outburst on November 7, 1994, Galbraith's alleged tendency toward violence, Landt's alleged derogatory attitude toward women, the alienation and lack of co-worker training allegedly experienced by plaintiff, and Bell Atlantic's failure to have a more comprehensive and active policy against sexual harassment and discrimination would lead a reasonable woman to feel the conditions of her employment had been altered and the environment had become hostile. On the other hand, a fact finder may disbelieve plaintiff's contentions about the alienation she experienced, the allegedly discriminatory and violent outbursts and name-calling she suffered, the lack of assistance she allegedly received from her supervisors, and Bell Atlantic's failure to properly train its employees on sexual harassment and discrimination. Instead, a fact finder may decide that the treatment allegedly suffered by plaintiff does not satisfy the *Lehmann* criteria. Because these are purely issues of fact that must be decided at trial, we will deny Bell Atlantic's motion for summary judgement on plaintiff's hostile work environment claim in Count Two.

## F. Count Four: Intentional Infliction of Emotional Distress Against Galbraith

To establish an intentional infliction of emotional distress claim under New Jersey law, a plaintiff must show (1) that the defendant intended to cause emotional distress, (2) that the conduct was extreme and outrageous, (3) that the actions proximately caused emotional distress, and (4) that plaintiff's emotional distress was severe. *Buckley v. Trenton Saving Fund Soc.*, 111 N.J. 355, 366, 544 A.2d 857 (1988); *see Decker v. Princeton Packet, Inc.*, 116 N.J. 418, 430, 561 A.2d 1122 (1989); *DeJoy v. Comcast Cable Communications, Inc.*, 968 F.Supp. 963, 966 (D.N.J.1997). Because the Court finds that defendants have not shown extreme and outrageous conduct on the part of defendants, summary judgment as to this claim will be granted.

To establish extreme and outrageous conduct, a plaintiff must show conduct " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Buckley*, 111 N.J. at 366, 544 A.2d 857 (quoting *Restatement (Second) of Torts* § 46 cmt. d (1965)). At the outset, we note that "the limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct." *Fregara v. Jet Aviation Business Jets*, 764 F.Supp. 940, 956 (D.N.J.1991) (quoting *Cautilli v. GAF Corp.*, 531 F.Supp. 71, 74 (E.D.Pa.1982)). This is especially true in the employment context. Indeed, courts have found that "it is extremely rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery." *Id.* (quoting *Cox*, 861 F.2d at 395).[6] Other jurisdictions

---

6. Another obstacle facing plaintiffs who bring intentional infliction of emotional distress claims arising out of an employment relationship is the tort bar of the relevant workman's compensation statute. In some states, the workman's compensation statute provides the sole remedy of the employee against the employer, regardless of whether the tort was intentional. *See, e.g.,* 77 P.S. § 481(a); *Poyser v. Newman & Co.,* 514 Pa. 32, 522 A.2d 548 (1987); *Doe v. William Shapiro, Esquire, P.C.,* 852 F.Supp. 1246, 1253 (E.D.Pa. 1994); *Kinnally v. Bell of Pennsylvania,* 748 F.Supp. 1136, 1143–44 (E.D.Pa.1990). The New Jersey tort bar, however, contains an exception

for "intentional wrongs." *N.J.S.A.* § 34:15–8. To recover for an "intentional wrong," a plaintiff must show an "actual intent" or "subjective desire" to injure. *Millison v. E.I. du Pont de Nemours & Co.,* 101 N.J. 161, 170–73, 501 A.2d 505 (1985).

A plaintiff who could meet the heavy burden of proving the intentional infliction of emotional distress in the workplace might also prove a case that fits within the "intentional wrong" exception to the tort bar. Whether the tort bar would preclude a workplace-related intentional infliction of emotional distress claim where the em-

adopting the *Restatement* definition of the tort have concluded that "as a general rule, sexual harassment alone does not rise to the level of outrageousness necessary to make out a cause of action for intentional infliction of emotional distress." *Andrews,* 895 F.2d at 1487 (applying Pennsylvania law). Instead, the cause of action will lie in a harassment case only where the employer both sexually harasses the employee and retaliates against her for turning down sexual propositions. *Id.*

The Court cannot conclude that the actions of Galbraith here were so extreme and outrageous as to be utterly intolerable in a civilized community.[7] It is true that Galbraith treated plaintiff in a rude, unprofessional manner and that his outburst at the November 7, 1994 meeting, for which he should have apologized, was completely unacceptable. Nonetheless, Galbraith's behavior simply does not rise to the level of outrageousness necessary to constitute intentional infliction of emotional distress.

Furthermore, the conduct to which plaintiff was subject is not as outrageous as that which other courts have found inadequate to support a harassment-based intentional infliction of emotional distress claim. *See, e.g., Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395–96 (3d Cir.1988) (termination of plaintiff on the first day of his return following triple-bypass surgery where employer knew of surgery, knew his emotional and physical recuperation were incomplete, knew it was endangering the plaintiff's medical and disability benefits, and knew it was depriving him of a valuable ·therapeutic tool and jeopardizing his chances to obtain alter-

nate employment); *Asen v. Cooper Hospital/University Medical Center,* 1996 WL 347451 1996 U.S. Dist. LEXIS 8680 (D.N.J. 1996) (plaintiff's supervisor limited her access to department records, instructed and/or allowed personnel to ignore her requests for information, moved her office to distance her from department activities, did not invite her to department meetings, took away her responsibilities and ignored her inquiries about questionable practices); *Fregara v. Jet Aviation Business Jets,* 764 F.Supp. 940, 956 (D.N.J.1991) (plaintiff threatened with discharge, asked to resign, overworked, required to attend counseling sessions dealing with his performance, told he was not doing a good job, given warning notices, and closely monitored); *Brunner v. Abex Corp.,* 661 F.Supp. 1351, 1353 (D.N.J. 1986) (termination of employee while she was moving into a new house she had bought to accommodate relocation by her employer); *Aquino v. Sommer Maid Creamery, Inc.,* 657 F.Supp. 208, 211 (E.D.Pa.1987) (harassment, beratement and oversupervision of female employee, along with male supervisor following her into women's bathroom). The intentional infliction of emotional distress claim therefore fails on its merits and summary judgment will be granted to Galbraith on Count Four of plaintiff's claim. Galbraith will therefore be dismissed from the case as there are no remaining claims against him.

### G. *Federal LMRA and ERISA Claims Against Bell Atlantic*

In Count Five of her complaint, plaintiff alleges that "Bell Atlantic never provided

---

ployer "acts recklessly in deliberate disregard of a high probability that emotional distress will follow," *Buckley,* 111 N.J. at 366, 544 A.2d 857, is a question we need not resolve at this time.

**7.** We note that the New Jersey Supreme Court's recent opinion in *Taylor v. Metzger,* 152 N.J. 490, 706 A.2d 685 (1998) does not alter our view that Galbraith's conduct does not meet the standards for intentional infliction of emotional distress. In *Taylor,* the court determined that a reference by the Sheriff of Burlington County to an African–American sheriffs officer as a "jungle bunny" in the presence of another supervising officer was sufficiently extreme and outrageous to survive a motion for summary judgment. Taylor is distinguishable on two important grounds.

First, the slur was made by the Sheriff, the plaintiff's ultimate supervisor. The Court was careful to note that "[d]efendant was not an ordinary co-worker of plaintiff; he was the Sheriff of Burlington County, the chief executive of the office in which plaintiff worked. That fact greatly magnifies the gravity of the comment." *Id.* at 503, 706 A.2d 685, *see id.* at 506, 706 A.2d 685. Here, Galbraith was merely a co-worker. Second, the severity of the "jungle bunny" slur, as opposed to the term "bitch" which plaintiff admits she herself uses, is so vicious that the Court found that it was "in an of itself ... capable of contaminating the workplace." *Id.* at 503, 706 A.2d 685. Thus, we feel *Taylor* is not controlling here.

[plaintiff] with her accrued vacation time for 1994 or for any time for which she may be entitled." In Count Six, plaintiff alleges that she was denied a collectively bargained-for wage increase, and that Bell Atlantic breached the terms of its Sickness Accident and Disability Benefits Plan and denied her STD benefits. In Count Seven, which was just recently added in an amended complaint and has therefore not been addressed by the parties in the papers, plaintiff alleges that defendants Bell Atlantic, Metropolitan Life Insurance and/or Mutual of Omaha Life Insurance Company, and Bell Atlantic Corporation denied her LTD benefits in violation of the terms of Bell Atlantic's LTD policy.

By Order entered on February 25, 1997, the late Honorable Clarkson S. Fisher held that plaintiff's claims for accrued vacation leave and wage increase were preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and that plaintiff's claim for disability benefits was preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109, 1132. *See Ferraro v. Bell Atlantic Co.*, 955 F.Supp. 354 (D.N.J.1997). Defendants argue that plaintiff's LMRA claims for vacation leave (in Count Five) and the wage increase (in Count Six) are subject to the exclusive grievance and arbitration provisions of the Union's collective bargaining agreement and therefore must be dismissed. They also argue that plaintiff's ERISA claim for STD benefits must be dismissed because, according to the terms of the STD plan, she had not completed 20 years of net credited service as of the eighth day of disability absence. For the reason set forth below, we agree.

1. *Count Five—Accrued Vacation Time and Count Six–Lost Wage Increase: LMRA Claims*

The late Honorable Clarkson S. Fisher previously held in this matter that plaintiff's claims for accrued vacation time (Count Five) and lost wage increase (Count Six) are governed solely by the collective bargaining agreement between plaintiff's Union and Bell Atlantic. Thus, plaintiff is bound by the terms of that agreement in seeking relief for any alleged violations of the policies regarding accrued vacation time and lost wage increase.

In suits arising under Section 301 of the LMRA, courts must give "full play" "to the means chosen by the parties for settlement of their differences under the collective bargaining agreement." *United Steelworkers of America v. American Mfg. Co.*, 363 U.S. 564, 566, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960). Congress has clearly expressed its intent that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). Thus, courts must be careful not to interfere with functions which parties to a collective bargaining agreement have properly entrusted to the grievance arbitration procedure. *See United Steelworkers*, 363 U.S. at 566, 80 S.Ct. 1343; *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

It is well established that an employee must exhaust the grievance procedures provided by an applicable collective bargaining agreement before bringing suit pursuant to LMRA, 29 U.S.C. § 185, for breach of that agreement. *See Republic Steel Corp. v. Maddox*, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). Particularly where the applicable collective bargaining agreement specifically provides that it is to be the exclusive remedy of the parties for any alleged breach, an employee is bound by the disposition of the claim under the proscribed procedure. Even if the agreement does not require plaintiff to undergo arbitration of her claims, federal courts should still defer to the parties chosen method of settling grievances. "It is not arbitration per se that federal policy favors, but rather final adjustment of differences by a means selected by the parties. If the parties agree that a procedure other than arbitration shall provide a conclusive resolution of their differences, federal labor policy encourages that procedure no less than arbitration." *Teamsters Local Union No. 30 v. Helms Express, Inc.*, 591 F.2d 211 (3d Cir.), *cert. denied*, 444 U.S. 837, 100 S.Ct. 74, 62 L.Ed.2d 48 (1979). Only where

the employee can demonstrate that the union breached its duty of fair representation is an employee free to pursue his claim in court. *See DelCostello v. Int'l Brotherhood of Teamsters*, 462 U.S. 151, 164, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Findley v. Jones Motor Freight*, 639 F.2d 953, 957 (3d Cir.1981).

In the instant case, the collective bargaining agreement between Bell Atlantic and the Union clearly expresses the parties' intent to make the contractual grievance procedure the exclusive mechanism for resolution of claims of breach. *See* Article XI, Grievance Procedure, Agreement Between Local 827 International Brotherhood of Electrical Workers, AFL—CIO and New Jersey Bell Telephone Company, effective August 9, 1992 through May 20, 1995, Exh. B to Agrusti Aff. It states "[n]either the Company nor the Union will attempt by means other than the grievance procedure to bring about the settlement of any issue which is properly a subject for disposition through the grievance procedure." Disputes like the present over the intent and meaning of provisions of the agreement must be resolved through the grievance procedure set forth in the collective bargaining agreement. Section 4 of Article XI states "[i]f any grievance involving a controversy over the true intent and meaning or the application, in any particular instance, of any provision of this Agreement, is not satisfactorily adjusted under the provisions of Sections I and 2 above, the Union [must give] written notice to the Director–Labor Relations appealing the grievance specified ... [and] identify the particular provision(s) if the Agreement at issue." Section 1 and 2 of Article XI set forth the proper steps an employee with a grievance must take. Plaintiff failed to follow these procedures. According to its terms, the collective bargaining agreement provides the proper remedy for any alleged employment related dispute. Thus, plaintiff must seek redress under the terms of the agreement and is precluded from seeking relief before this Court. Accordingly, her LMRA claim must be dismissed and summary judgment granted in favor of Bell Atlantic.

### 2. *Count Six: STD Benefits Under ERISA*

Plaintiff's claim for LTD benefits has now been set forth at length in a new count, Count Seven, of her amended complaint. Therefore, we will consider that claim under Count Seven rather than Count Six and focus our analysis of Count Six solely on her claims for STD benefits. Plaintiff has failed to demonstrate her entitlement to additional STD benefits. Pursuant to the Bell Atlantic's SADBP, the amount of sickness disability benefits an employee receives depends upon an employee's base pay, the number of hours they are regularly scheduled to work, and their net credited service as of the eighth calendar day of their absence. On the eighth day of her absence, plaintiff had not yet achieved twenty years of net credited service, a fact plaintiff conceded during her deposition. Consequently, plaintiff was only eligible to receive full pay for up to twenty-six weeks, not for thirty-nine weeks as she now claims. Thus, we will grant summary judgment to Bell Atlantic on plaintiff's claim that she was wrongfully denied STD benefits under the Bell Atlantic SADBP.

### 3. *Count Seven: LTD Benefits Under ERISA*

As the plaintiff's ERISA claim for LTD benefits in Count Seven was just recently added and the parties have not yet had an opportunity to argue its merits nor file any motions addressing it, no motion is now before us for decision. Thus, Count Seven of plaintiff's complaint remains for decision at trial.

## III. CONCLUSION

For the foregoing reasons, we will grant summary judgment to Bell Atlantic on plaintiff's claims in Counts Three, Five and Six of her complaint. We will also grant summary judgment as to defendants Pierson and Jahnke on Counts One, Two and Three of plaintiff's complaint and dismiss these defendants from the case. Summary judgment will be granted to Galbraith on Count Four of plaintiff's complaint and he will also be dismissed from the case. As there are material facts still in dispute as to plaintiff's

NJLAD claims in Counts One and Two, we will deny Bell Atlantic's motion for summary judgment and allow plaintiff to proceed to trial on these claims. Having no motion pending before the Court on Count Seven, which was recently added in plaintiff's amended complaint, the ERISA claim in Count Seven also remains for decision at trial.