**Lizsandra MARRERO, Plaintiff,**

v.

**CAMDEN COUNTY BOARD OF SO-CIAL SERVICES, Clement Carney, Robert Ellis, Sandra Mayers, and Junious Coles and John Doe Decision Makers, Defendants.**

No. CIV. A. 00–3233(JEI).

United States District Court,
D. New Jersey.

Oct. 4, 2001.

infliction of emotional distress, and invasion of privacy would fail anyway.

Press & Long, P.A. by Richard L. Press, Northfield, NJ, for Plaintiff.

Marshall, Dennehey, Warner, Coleman & Goggin by Richard L. Goldstein, Cherry Hill, NJ, for Defendants Camden County Board of Social Services, Clement Carney, Robert Ellis and Sandra Mayers.

**OPINION**

IRENAS, District Judge:

Presently before the Court is the summary judgment motion of Defendants Camden County Board of Social Services, Clement Carney, Robert Ellis and Sandra Mayers. Plaintiff Lizsandra Marrero, a former unit clerk in the income maintenance unit of the Board of Social Services ("the Board"), asserts several claims relating to the manner in which she was treated during her tenure with the Board and to the circumstances under which she was ultimately dismissed from her position. Plaintiff contends that she was unlawfully subjected to disciplinary action, and was later fired, because she exercised her constitutionally-protected rights to object to the conditions of her employment and that her dismissal violated the provisions of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601, *et seq.* Plaintiff also asserts gender discrimination and retaliation claims under the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. 10:5–1, *et. seq.*, and claims for

intentional infliction of emotional distress and interference with prospective economic advantage [1]. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

Because there remain issues of material fact relating to whether the actions taken against Plaintiff in response to conduct protected by the First Amendment and the LAD, and because Plaintiff has offered sufficient evidence to allow a trier of fact to conclude that the Defendants violated the notice and certification provisions of the FMLA by refusing to consider granting her a leave of absence, summary judgment on Plaintiff's FMLA and retaliation claims will be denied. However, because Plaintiff has not made the required showing that the actions taken against her would not have occurred "but for" her gender and because she has not demonstrated the necessary elements of her tort claims, summary judgment on those claims will be granted.

## I.

In 1978, the Camden County Board of Social Services adopted a formal dress code policy designed to create a "positive image" for the agency. This dress code remained in effect throughout Plaintiff's tenure with the Board, which began in November, 1992 and ended in July, 2000.

Plaintiff's "difficulties at the workplace" began in March, 1997, when she was first disciplined for failing to adhere to the Board's dress policy.[2] (Am. Compl. at 2). Plaintiff testified at her deposition that she responded to this action by speaking with a union representative, who contacted Clement Carney, the Deputy Director of the Board of Social Services, on Plaintiff's behalf. (Pl. Dep. at 76). On September 9, 1997, that representative, Rosetta Pitts, directed a letter to Robert Ellis, the Board's Director, informing him that the union opposed the disciplinary action taken against Plaintiff. According to Plaintiff, this letter was the result of a "series of correspondence" between Pitts, Carney and Sandra Mayers, the Administrator of the Income Maintenance Unit. On September 16, 1997, Plaintiff was again sent home because of the way she was dressed. This action was followed by a letter from Mayers stating that should Plaintiff again run afoul of the dress code, more serious disciplinary action would follow.

Plaintiff alleges that things "escalated" after the 1997 incidents. (Am. Compl. at 2). In addition to the "numerous occasions" on which she was criticized for dressing inappropriately, Plaintiff claims that she was the subject of inappropriate and harassing comments such as "your panties are showing", "I can see the print of your privates" and "are you wearing your daughter's clothes" made by Defendants and others. (Am. Compl. at 3). In July of 1999, Plaintiff sent Defendants a Tort Claims Notice, pursuant to N.J.S.A. § 59:8-4, claiming that "several events occurring over the last two to three years ... have created a hostile work environment which has continued to the present date." (Pl.Ex.PP). Plaintiff also claimed to have been subject to "retaliation" for reporting an incident of sexual assault that

---

1. Plaintiff also asserts claims under the New Jersey Constitution against the Board and Defendants Carney, Ellis and Mayers and tort claims against Defendant Junious Coles, a coworker. However, Defendants' motion does not seek summary judgment on any of those claims.

2. On this occasion, Plaintiff was instructed to leave work and to change her clothing before returning. Plaintiff states that she was not paid for this time out of the office. This was the manner in which each of Plaintiff's subsequent dress code violations were addressed by the Board.

occurred between her and Defendant Junious Coles.[3] (*Id.*).

Plaintiff claims that she was again sent home for violating the dress code on July 21, 1999, the same day that Defendants received and allegedly discussed Plaintiff's Tort Claims Notice. (Pl. Dep. at 206, 207).[4] According to Plaintiff, things "got worse for me after I went to get advice from an attorney," in early 1999. (Pl. Dep. at 207). Plaintiff stated that during 1999 she was sent home from work more frequently and that the Board "had people watching over me", which "result[ed] in ... being forced to leave work due to an anxiety reaction." (Pl. Stmt. of Mat. Facts at 18; Pl. Dep. at 207). This leave was ultimately designated as FMLA leave and lasted six weeks. Upon returning to work in September, 1999, rather than being reassigned to her old job as a unit clerk, Plaintiff became a "floater", a position which she contends was "less desirable." (Am. Compl. at 6). Plaintiff concedes, however, that this position was equivalent to her former job as a unit clerk in terms of responsibilities, salary and benefits and that she was restored to her unit clerk position within two months. (Pl. Dep. at 189).

On June 1, 2000, Plaintiff filed an action in the Superior Court of New Jersey, alleging, *inter alia*, sexual harassment, gender discrimination and retaliation in violation of the LAD and the First Amendment. (Defendants later removed the case to this Court.)

On June 26, 2000, Plaintiff was once again called to meet with Mayers and Carney to discuss alleged dress code violations. Plaintiff testified that she "got upset" by the demand, left the office and did not return to work that day. (Pl. Dep. at 187, 188).

The next day, Plaintiff called her supervisor, William Tucker and left a voice mail message stating that she had suffered an "anxiety attack" and would need to be placed out on leave. According to Plaintiff, she was at that time experiencing "nervousness, crying" and an inability to work "due to a hostile work environment." (Pl. Stmt. of Mat. Facts at 12). At the time of her call, Plaintiff had apparently already visited her physician, Dr. Arthur McDermott, who had recommended that she take a leave of absence. (Pl. Dep. at 169). Plaintiff then called the Board's personnel department, stated that she had been placed on a "sick leave" by her doctor and requested that the appropriate forms be sent to her. (*Id.* at 172). What happened next is a matter of some contention. Plaintiff states that Clement Carney got on the phone and "in a very loud tone of voice" told her that her leave was not accepted and "to get back to work or ... be terminated." (*Id.*). Carney, however, insists that he simply advised Plaintiff of the proper procedure for requesting sick leave. (Carney Dep. at 36, 37).

In any case, Plaintiff did not report to work the following week. Plaintiff states that she did, however, immediately request

3. According to Plaintiff, on May 17, 1999, Defendant Coles, a co-worker and former boyfriend, exposed himself to her in the parking lot outside the Social Services building. While Plaintiff originally contended that this event was the result of the hostile environment created by Defendants Ellis, Carney and Mayers, she concedes in her brief that Coles' actions were "personally motivated" and occurred outside of work. (Pl. Br. at 41).

4. Plaintiff states in her brief that she was sent home on July 21, 2000. However, the portions of her deposition provided to the Court do not specify the exact date. It should also be noted that Plaintiff refers to her own longhand notes relating to that day's events, but has not provided the Court with copies, although it appears that she intended to.

a letter from Dr. McDermott stating the basis for his diagnosis. (Pl. Dep. at 173–174). On July 5, Plaintiff sent a letter to Director Ellis, along with state disability forms she had received from Dr. McDermott, stating that she was on sick leave and would like the completed disability forms returned to her. (Pl.Ex.V).

The forms, however, were never sent back. Instead, Carney sent her a letter, dated July 7, stating that if Plaintiff wanted to request sick leave, she needed to follow the procedures outlined in the Board's employee handbook and the union collective bargaining agreement. In the interim, the letter stated, she was considered on unauthorized leave and would be regarded, pursuant to N.J.A.C. 4A2–6 .2(b), as having resigned not in good standing. Although Dr. McDermott ultimately did send a letter (dated July 18) to the Board confirming his diagnosis, Plaintiff was, after a disciplinary hearing before Defendant Ellis (which Plaintiff did not attend), fired on July 28, 2000.

Plaintiff moved, pursuant to Fed. R.Civ.P. 15(a), to add her FMLA claims to the Complaint and to incorporate the events of June and July into her existing discrimination and retaliation claims. This request was granted by the Court on October 20, 2000 and the Amended Complaint was filed on October 25. The instant Motion for Summary Judgment was filed on August 20, 2001.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248, 106 S.Ct. 2505 (citation omitted).

## III.

Plaintiff contends that she was suffering from a "serious health condition" when she left work in June, 2000 and that because her subsequent absences were protected by the FMLA, the Defendants violated the Act by discharging her for excessive absenteeism during that period. Defendants respond that, regardless of whether her absence was protected by the FMLA, Plaintiff had an "independent" obligation to comply with the Board's own sick leave notification procedures and that her failure to do so constituted a "legitimate non-discriminatory reason for terminating plaintiff's employment." (Def. Reply at 4).

### A.

Congress enacted the Family and Medical Leave Act of 1993 "to balance the demands of the workplace with the needs of families, to promote the stability and economic security of families, and to promote national interests in preserving family integrity." 29 U.S.C. § 2601(b)(1); 29

C.F.R. § 825.101. The Act entitles eligible employees to twelve unpaid workweeks of leave during "any 12–month period." 29 U.S.C. § 2612(a)(1). As it concerns this case, the Act provides leave for an employee suffering from a "serious health condition" that "makes the employee unable to perform the functions of [his or her] position," and entitles such employees to reinstatement upon their return. 29 U.S.C. §§ 2612(a)(1)(D), 2614(a).

Courts interpreting the FMLA have recognized that the Act creates two relatively distinct causes of action. *See, e.g., Bachelder v. America West Airlines, Inc.,* 259 F.3d 1112 (9th Cir.2001); *Strickland v. Water Works and Sewer Board of the City of Birmingham,* 239 F.3d 1199 (11th Cir. 2001).

First, the FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided by the Act. 29 U.S.C. § 2615(a)(1). Claims under this provision are often referred to as "interference" claims. *See Strickland,* 239 F.3d at 1207, fn. 9. In addition, the FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by [§ 2615]." 29 U.S.C. § 2615(a)(2). Such claims are usually described as "discrimination" claims. *See Strickland,* at fn. 9.

The claim asserted by the Plaintiff in this case is properly analyzed as an interference claim under § 2615(a)(1). The crux of Plaintiff's claim is that because she was entitled to FMLA leave in June of 2000, the absences for which she was fired could not lawfully be considered as grounds for dismissal. Contrary to Defendants' contentions, Plaintiff's is not a discrimination claim. As the Seventh Circuit has noted:

the question in a discrimination case is whether the employer treated one employee worse than another on account of something ... that a statute makes irrelevant.... A statute such as the FMLA, however, creates substantive rights. A firm must honor statutory entitlements; when one employee sues, the firm may not defend by saying that it treated all employees identically.

*Diaz v. Fort Wayne Foundry Corp.,* 131 F.3d 711, 712 (7th Cir.1997). The issue that Plaintiff has raised is not whether the Board applied its five-day absence rule fairly to all its employees or whether the Board's reasons for firing Plaintiff were pretext for retaliating against her because of her FMLA leave. Instead, the issue is simply whether Marrero was entitled to FMLA leave in June 2000 and whether she took the necessary steps to inform the Board that she intended to take that leave. Defendants' emphasis on the "legitimate, non-discriminatory" basis for Plaintiff's termination is therefore misplaced, as the Board's subjective intent is irrelevant to this issue.

**B.**

Central to the purposes of the FMLA is that its provisions apply even where the entitlements created by the Act are in excess of those that an employer would be willing or able to provide on its own. 29 C.F.R. § 825.101; *Victorelli v. Shadyside Hospital,* 128 F.3d 184, 186 (3d Cir.1997). To this end, the FMLA states that the rights it creates "shall not be diminished by any collective bargaining agreement or any employment benefit program or plan." 29 U.S.C. § 2652(b). Thus, the Camden County Board of Social Services' sick leave policy, and any collective bargaining agreements to which it is a party, must be considered invalid to the extent that they "diminish" the rights created by the FMLA. Simply put, where an

employer's internal policies conflict with the provisions of the FMLA, the FMLA controls and an employee need only comply with the requirements of the Act to invoke its protections.

 The Board's 2000 Employee Handbook [5] and the contract between the Board and the Communication Workers of America, Plaintiff's union, state that an employee must provide a doctor's certificate for any absences in excess of five consecutive days. However, according to the Department of Labor's FMLA regulations, where an employee seeks "unforeseeable" medical leave, an employer who wishes to confirm the employee's condition must first request a medical certification from the employee and then give the employee at least 15 calendar days in which to comply. 29 C.F.R. § 825.305. Thus, while the Board is obviously free to impose a five-day rule for the granting of non-FMLA sick leave, where the FMLA is implicated, the Board must afford each employee at least fifteen days in which to provide a requested certification.[6]

Given that § 825.305 seems to address the same notice issue as does the Board's

sick leave policy, it is difficult to see how, as the Board contends, their policy does ·not diminish the protections of the FMLA. It seems clear that, at least from the perspective of an employee suffering through an unexpected medical emergency, a policy that provides five days, rather than fifteen, in which to determine that the condition necessitates extended FMLA leave, to visit a physician and to provide documentation of that visit and the condition, clearly "diminishes" the rights provided by the FMLA.[7]

## C.

The issue, then, is whether the Plaintiff was entitled to FMLA leave for her condition and whether she complied with the provisions of the FMLA regarding obtaining that leave. See 29 C.F.R. §§ 825.303; 825.305.

Under the FMLA, a "serious health condition" is defined as:

(a) an illness, injury, impairment, or physical or mental condition that involves:

---

**5.** Although this handbook was promulgated in September, 2000, after Plaintiff had been let go, it appears that the provisions contained therein relating to sick leave had not changed from those in effect during Plaintiff's employment.

**6.** An employer's duty to afford an employee the protections of the FMLA begins as soon as "the employee provides the employer with enough information to put the employer on notice that FMLA-qualified leave is needed." *Stoops v. One Call Communications*, 141 F.3d 309, 312 (7th Cir.1998). "The employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means." 29 C.F.R. § 825.303(b). This provision is consistent with the general tenor of the FMLA, which places the burden of obtaining needed

information on the employer, rather than the employee. Even if Defendants were to challenge the sufficiency of Marrero's initial notice to Tucker and Carney (although it does not appear that they do so), this would not be a basis for granting summary judgment, as "generally, the sufficiency of notice is a matter for the jury." *Zawadowicz v. CVS Corp.*, 99 F.Supp.2d 518, 529 (D.N.J.2000) (Brotman, J.) (Citing *Hopson v. Quitman Co. Hospital*, 126 F.3d 635, 640 (5th Cir.1997)). See also, *Price v. City of Fort Wayne*, 117 F.3d 1022, 1026 (7th Cir.1997) ("Whether [plaintiff] gave the notice required is necessarily a question of fact.").

**7.** Section 825.305 also provides that the fifteen-day deadline must be extended if notice within fifteen days is not practicable given the circumstances. However, the Board's policy and the CBA provide no such flexibility.

(1) Inpatient care in a hospital, hospice, or residential medical care facility including any period of incapacity ... or any subsequent treatment in connection with such inpatient care; or

(2) Continuing treatment by a health care provider [which is defined as]:

(i) a period of incapacity ... of more than three consecutive calendar days, and any subsequent treatment or period of incapacity ... that also involves:

(A) treatment two or more times by a health care provider ...; or

(B) treatment by a health provider on at least one which results in a regimen of continuing treatment under the supervision of a health care provider....

29 C.F.R. § 825.114. The Defendants do not appear to challenge the seriousness of the Plaintiff's condition and therefore it is sufficient for the purposes of this motion to note that there is nothing in the statute or regulations that prevents Plaintiff's anxiety and depression from qualifying as a serious condition under the Act. Indeed, the regulations expressly recognize the seriousness of mental illness under certain circumstances. See 29 C.F.R. § 825.114(c) ("Mental illness resulting from stress or allergies may be serious health conditions, but only if all the conditions of this section are met.").

Under the FMLA, an employee is under no duty to provide any documentation of her condition unless and until her employer so requests. 29 C.F.R. § 825.305. If an employer doubts the seriousness or veracity of an employee's condition, it may request that the employee provide a certification issued by a health care provider. 29 U.S.C. § 2613. If an employer seeks a certification, it must provide the employee with "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations." 29 C.F.R. § 825.301(b)(1); *Zawadowicz.*, 99 F.Supp.2d at 527.

■ Defendants contend that Plaintiff failed to comply with the FMLA because "Plaintiff was asked to provide information and/or documentation as to the reason for her absence and abandonment of her position," but did not do so. (Def. Br. at 31). Although Defendants state that Plaintiff was only required to submit information "and/or" documentation, their primary objection seems to be that Plaintiff failed to provide them with a doctor's note explaining her absence.[8]

On July 7, 2000, Clement Carney wrote to Plaintiff stating that her July 5th letter was insufficient and that Plaintiff needed to provide a written statement from her physician "giving the reasons for [her] sick leave." This letter told her to return to work immediately, but did not give her any sort of deadline for the submission of her doctor's certification.

As noted above, if an employee informs her employer that she wishes to take FMLA leave, her employer must provide

---

**8.** Plaintiff did provide the Board with "information" relatively quickly. According to Plaintiff, during her June 27th conversation with Clement Carney, she requested that the Board's sick leave forms be sent to her. Carney allegedly responded by saying that Plaintiff's sick leave was denied and that "we are sending you no forms." (Pl. Notes, Ex. T of Pl. Stmt. Of Mat. Facts). On July 5, Plaintiff submitted a note to Director Ellis stating that her doctor had placed her on sick leave and attaching (somewhat) completed disability forms that had been given her by Dr. McDermott. These forms did provide information as to the nature of Plaintiff's condition. (Pl. Ex.V). As noted above, for the purpose of this motion, Plaintiff's June 27th phone calls to Defendants Tucker and Carney were sufficient to satisfy the requirements of the FMLA. Therefore, critical issue is whether Plaintiff complied with the requirements of the FMLA in providing a doctor's certification.

her with "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations" and giving her at least fifteen days from the date of the notice to comply. 29 C.F.R. §§ 825.301, 825.305. Further, FMLA leave may not be delayed or denied because of inadequate notice unless it is clear that the employee had *actual notice* of the FMLA's requirements. 29 C.F.R. § 825.304(c). See also, *Rager v. Dade Behring, Inc.*, 210 F.3d 776 (7th Cir.2000) ("[An] employer is required to notify the employee promptly and in writing of the 15–day deadline.").

There is no evidence at this stage that Plaintiff ever received notice of the date by which she had to provide certification of her condition. Even if the policies contained in the Board's employee handbook were sufficient to inform Plaintiff that a doctor's certification would be required,[9] Defendants were required to inform Plaintiff that she had fifteen days to provide the Board with that certification. This they did not do. Defendants were also required to post notices relating to FMLA leave and to include specific information in their employee handbook informing employees of their "entitlements and obligations" under the Act. 29 C.F.R. §§ 825.300, 825.301. This was not done either. (See Carney Dep. at 20–21). Thus, even without considering the very real possibility that Plaintiff did, in fact, comply with the fifteen-day rule, it is clear that there are serious questions of fact relating to whether Defendants met their FMLA notice obligations to Plaintiff and, accordingly, whether they were permitted to follow through with Plaintiff's termination.

Defendants argue, however, that they were justified in their dismissal of Plaintiff

because the certification ultimately provided by Dr. McDermott was "deficient since it failed to specify a date for her return to work, the nature and extent of her alleged disability, an appropriate diagnosis, and a statement that she was unable to perform the functions of her position." (Def. Br. at 32). While the regulations do permit an employer to request all of this information, 29 C.F.R. § 825.306, the employer need not do so. In any case, it is clear that an employer cannot request certain, limited information from an employee and then fire her for not providing further information beyond that specifically requested. Regardless, termination is not an appropriate response for an inadequate certification. Section 825.305(d) provides that where an employer finds a certification incomplete, it must give the employee a reasonable opportunity to cure any deficiencies.

█ Finally, the Court notes that while a defendant may defend against an FMLA charge by arguing that an employee would have been dismissed even had she not taken FMLA-protected leave, 29 C.F.R. § 825.216(a), *O'Connor v. PCA Family Health Plan, Inc.* 200 F.3d 1349 (11th Cir.2000), it is clear in this case that Plaintiff was discharged precisely because of her allegedly-protected absences. As this Court has stated before, FMLA-protected absences may not even be considered in deciding whether to terminate an employee for excessive absenteeism. *Viereck v. City of Gloucester City*, 961 F.Supp. 703, 708 (D.N.J.1997) (Irenas, J.). Accordingly, this defense is not available to Defendants.

### D.

To conclude, if Plaintiff's absences were protected by the FMLA, and if she com-

---

9. As noted above, this issue (dealing with the sufficiency of Defendants' notice to Plaintiff of her obligations under the Act) should generally be decided by a jury.

plied with the notice and certification requirements of the Act, those absences could not be, as they clearly were, considered as a basis for Plaintiff's dismissal. As discussed above, there remain a number of factual issues relating to the sufficiency and propriety of the parties' actions and those issues, such as whether Plaintiff's June 27 notice was sufficient to inform the Board that she wished to invoke the FMLA, are properly resolved by a jury. Accordingly, summary judgment as to the FMLA allegations contained in Count Six of Plaintiff's Amended Complaint is denied.

## IV.

### A.

Plaintiff also claims that she was subjected to disciplinary action, was "denied promotions and transfers," and was ultimately dismissed in retaliation for engaging in activities protected by the First Amendment of the United States Constitution.

It is well-settled that a public employee may bring a retaliation claim under 42 U.S.C. § 1983 where she is subjected to disciplinary action for reasons that infringe on her constitutionally-protected interest in freedom of speech. *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Feldman v. Philadelphia Housing Authority,* 43 F.3d 823, 829 (3d Cir.1994). While most of the decided cases have dealt with the issue of retaliatory discharge, the Supreme Court and the Third Circuit have recognized that any retaliatory conduct "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights" is actionable under § 1983. *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000) (recognizing a cause of action for "retaliatory harassment"). See also, *Rutan v. Republi-*

*can Party,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 ("The First Amendment ... protects state employees not only from patronage dismissals, but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee.") (internal quotations omitted).

Defendants respond initially to Plaintiff's allegations by arguing that none of the actions taken against her were "adverse." (Def. Br. at 23, 24). They contend that the Board's enforcement of its dress code policy, its decision to reassign Plaintiff as a "floater," and its denial of lateral transfers did not have a negative impact on Plaintiff and the conditions of her employment. For instance, Defendants comment that the enforcement of the dress code was not adverse because Plaintiff "was not demoted, suspended or terminated at that time." (Br. at 5).

Defendants' contentions are misplaced, however, as the scope of adverse action, for the purpose of a First Amendment retaliation claim, is not limited to drastic retaliation. As mentioned above, an employment action is considered adverse, for the purposes of determining unlawful retaliation, if it is likely to chill "a person of ordinary firmness" in the exercise of their First Amendment rights. *Dadonna,* 203 F.3d at 235. Plaintiff has asserted that, in retaliation for the various claims she filed against them, Defendants sent her home (without pay) for violating the dress code, castigated her in front of her co-workers, made derisive and unprofessional comments and finally dismissed her. It is clear that these actions, if taken with the intent to retaliate for protected speech, would be likely to deter the exercise of First Amendment rights. Thus, in light of the Third Circuit's statement that "it is a question of fact whether [a] campaign [of harassment] reache[s] the threshold of actionability under § 1983,"

*id.,* Plaintiff has alleged sufficient adverse conduct for the purpose of defeating summary judgment.

### B.

■ The Third Circuit has recognized a three-step framework for the analysis of First Amendment retaliation claims. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997), *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir. 1996). *See also, Pollock v. City of Ocean City,* 968 F.Supp. 187, 191 (D.N.J.1997) (Irenas, J.). First, an employee must demonstrate that the activity in question was protected by the First Amendment. *Green* at 885; *Feldman,* 43 F.3d at 829 (citing *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). With this done, the employee must then offer evidence demonstrating a causal connection between the protected activity and the adverse action taken by the employer. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Finally, an employer is given the opportunity to show "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the protected conduct." *Id.; Suppan,* 203 F.3d at 235; *Green,* 105 F.3d at 885.

■ The parties appear to agree that Marrero's conduct was protected by the First Amendment. Defendants state that "it is conceded that plaintiff's filing of the lawsuit in June of 2000 constituted protected activity" and do not put forward any arguments relating to the nature of Plaintiff's earlier claims. (Reply at 6). In any case, this Court has recognized that, in the Third Circuit at least, the filing of any lawsuit constitutes protected activity. *Pollock,* 968 F.Supp. at 191, 192 ("The First Amendment thus protects a public employee from employer retaliation for participating in a legal proceeding, either as a party or a witness."). As noted in *Pollock,* the Third Circuit's controlling decision in this area came in *San Filippo v. Bongiovanni,* 30 F.3d 424 (3d Cir.1994). *Pollock,* at 192. In *San Filippo,* the Court determined that special constitutional protection should be accorded to "an employee lawsuit or grievance if it is of the sort that constitutes a 'petition' within the meaning of the First Amendment." *Id.* at 441, 442. Clearly, therefore, the filing of Plaintiff's Tort Claims Notice, which is a required precursor to her lawsuit, and the ultimate filing of this lawsuit, constituted protected speech. *See Anderson v. Davila,* 125 F.3d 148, 162 (3d Cir.1997) (holding that the "right of access to court doctrine" applied to plaintiff's sending of notice of intention to sue prior to filing of formal complaint).

In addition, the 1997 filing of Plaintiff's union grievance is protected, as the *San Filippo* court noted that an employer's entry into a collective bargaining agreement providing a formal grievance procedure is "one example of formal governmental adoption of a mechanism for redress of grievances." *Id.* at 442.[10]

Because the issue of whether Plaintiff's speech was protected is a relatively easy

---

10. It should also be noted that the Third Circuit held, in *Azzaro v. County of Allegheny,* 110 F.3d 968 (3d Cir.1997), that an employee's report, to her supervisor, of another supervisor's sexual harassment constituted speech on a "matter of public concern" that was protected by the First Amendment regardless of whether a formal petition was ever filed. *See also Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (discussing the framework for determining if speech is on a matter of public concern). The facts discussed in *Azzaro* appear closely analogous to the facts of this case. If anything, Marrero's filing of a formal union grievance is even more worthy of protection than the informal, private speech of the plaintiff in *Azarro.*

one, the parties properly focus much of their attention on the issue of whether Plaintiff has offered sufficient evidence to demonstrate a causal connection between her protected conduct and the Board's actions against her.

■ In a case such as this, a sufficient causal connection is demonstrated where a plaintiff shows that constitutionally protected conduct was a "substantial" or "motivating" factor in an employer's decision. *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568 (citing *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270–71, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)); *Suppan*, 203 F.3d at 235. However, "under *Mt. Healthy's* burden-shifting, substantial factor/same-decision framework, the plaintiff is not required to prove 'but for' causation." *Suppan* at 236. Instead, the plaintiff must only show that the exercise of free speech rights played "some substantial role" in the employer's decision. *Id.* Where this is shown, the burden shifts to the employer to demonstrate that the same decision would have been made absent the protected conduct, that is, that "the protected conduct was *not* the but-for cause." *Id.*

In deciding a motion for summary judgment, the Court must "view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994). The Third Circuit has, in analyzing retaliation cases under Title VII of the Civil Rights Act of 1964, recognized that evidence of "temporal proximity" between protected conduct and adverse action is "an obvious method by which a plaintiff can proffer circumstantial evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action", *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir.1997) (citation

omitted). In *Pollock*, this Court recognized the strength of such evidence in establishing causation, emphasizing that the plaintiff's termination "came only weeks after plaintiff engaged in his protected conduct." 968 F.Supp. 187, 192 (citing Title VII cases).

■ Here, Plaintiff discusses three specific incidents the timing of which she contends establishes the requisite causal connection between Plaintiff's complaints and Defendants' adverse employment actions. First, Plaintiff points to the fact that, on September 16, 1997, one week after her union representative sent a letter to Robert Ellis objecting to the way Plaintiff had been disciplined for two prior dress code violations, Plaintiff was sent home for an alleged dress code violation and a letter from Sandra Mayers threatening further disciplinary action was sent to her.

Second, as mentioned, Plaintiff alleges that, after the Board received her 1999 Tort Claims Notice, "things got worse." She alleges (although the dates she indicates in her brief are neither supported or refuted by the deposition excerpts given to the Court) that she was sent home for violating the dress code on July 21, 1999, the very same day that Defendants received her Tort Claims Notice.

Finally, Plaintiff was again disciplined for dress code violations three weeks after she filed this lawsuit in June, 2000. As further evidence, Plaintiff points to the fact that she stopped receiving performance evaluations in the Fall of 1997, soon after her problems with Defendants began, and that these evaluations were relevant to her applications for lateral transfer and promotion. Given this contentious state of affairs, it seems a reasonable inference that Defendants actions were motivated by their anger over what they perceived as baseless claims. However, this evidence

need not be considered in isolation, as it has been recognized that "it is causation, not temporal proximity ... that is an element of plaintiff's ... case." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000).

It has been recognized in the Title VII context that evidence of a pattern of antagonism between employer and employee is persuasive evidence of retaliation. *See Kachmar* 109 F.3d at 177 ("Where there is a lack of temporal proximity, circumstantial evidence of a pattern of antagonism following the protected conduct can also give rise to the inference [of causation]."). In this case, Plaintiff noted that things got worse for her after the filing of her Tort Claims Notice, as evidenced by the fact that she needed to take a month's leave of absence due to stress, anxiety and depression. Further, given the testimony of Plaintiff and others (*see* Walker Rice Dep., Goodwin Dep., Ackley Dep., Tazewell Dep.) of the selective enforcement of the dress code against Plaintiff, a jury could reasonably find that a pattern of antagonism existed between Defendants and Plaintiff and that this was triggered by Plaintiff's complaints.

Finally, the statements and deposition testimony of several of the Defendants themselves permit an inference of retaliatory motivation. When Plaintiff reported her grievance to her union representative, Clement Carney allegedly became angry and shouted "don't even tell me that I'm singling you out! I'm sick and tired of you dressing in tight clothes!" This "singling out" comment appears to be a reference to Plaintiff's union complaint and could lead to an inference that Carney's subsequent actions were motivated, at least in part, by his anger over Plaintiff's allegations. Further, Carney and Mayers both testified that they were "angered" or "bothered" by the filing of Marrero's lawsuit. This testimony is sufficient, in conjunction with the evidence discussed above, to lead a finder of fact to the conclusion that a retaliatory motive played a substantial role in Defendants' decision.

The final issue to be addressed under the *Mt. Healthy* framework is whether Defendants have demonstrated that the employment actions taken against Plaintiff would have occurred even in the absence of protected conduct. *Mt. Healthy* at 287, 97 S.Ct. 568. Defendants have attempted to justify their actions by arguing that they were simply enforcing the Board's neutral dress code and attendance policies. However, the evidence offered by the Plaintiff relating to the selectivity with which those policies were enforced prevents the conclusion, at this juncture, that Defendants' actions would have been taken absent Plaintiff's protected speech.

As noted, Plaintiff has offered evidence that the Board's dress code was rarely enforced against anyone else. Further, the fact that Plaintiff was granted FMLA leave with relative ease in August, 1999 indicates that Defendants had the ability to delay termination proceedings at their discretion. The policy under which Plaintiff was terminated states that an employee who is absent from work for five consecutive days *without approval* should be considered to have resigned. N.J.A.C. 4A:2–6.2(b). The provision of the New Jersey Administrative Code upon which Defendants rely goes on to state that "approval of the absence shall not be unreasonably denied." *Id.* Defendants have not offered any evidence to demonstrate that their actions were consistent with their prior practices and that, especially given the clear requirements of the FMLA, approval of Plaintiff's absence was not unreasonably denied. Therefore, it is concluded that Defendants have not met their burden, under *Mt. Healthy* and its progeny, of

showing by a preponderance of the evidence that their disciplinary actions against Plaintiff would have occurred absent her protected conduct.

### C.

Defendants' final argument is that summary judgment should be granted as to the Board of Social Services because Plaintiff has failed to demonstrate any custom or policy of the Board that can provide the basis for a jury finding of municipal liability under § 1983.

In *Monell v. Department of Social Services,* the Supreme Court held that the doctrine of *respondeat superior* is inapplicable to § 1983 and that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy caused a constitutional tort." 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In *Pembaur v. City of Cincinnati* the Court noted that "particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances." 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Accordingly, "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business". *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). The critical inquiry, therefore, is whether any of the Defendants in this case possessed "final policymaking authority" in the areas at issue. *Id.*

██ Although neither party discusses it, the issue of "whether a particular official has final policymaking authority is a question of state law." *Jett v. Dallas In-*

*dependent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989) (quoting *Praprotnik,* 485 U.S. at 123, 108 S.Ct. 915). Thus, the Court must look to the laws of New Jersey and Camden County to determine which, if any, of the Defendants possessed final authority with respect to enforcement of the dress code policy and the termination of employees.

"The identification of those officials whose decisions represent the official policy of the local governmental unit itself is a legal question to be resolved by the trial judge before the case is submitted to the jury." *Jett,* 491 U.S. at 737, 109 S.Ct. 2702. However, once such a determination is made, "it is for the jury to determine whether their decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Id.* (citation omitted).

██ In *Andrews v. City of Philadelphia,* the Third Circuit found the Philadelphia Police Commissioner to be a policymaker based on the fact that he had "promulgated and disseminated" the Departments training manual relating to the issue of sexual harassment and had issued bulletins and regulations on the issue. 895 F.2d 1469, 1481 (3d Cir.1990). In this case, while none of the parties moves beyond bald conclusory statements in discussing the policymaking authority (or lack thereof) of any of the Defendants, a consideration of the factors discussed in *Andrews* leads to the conclusion that Robert Ellis, as Director of the Board of Social Services, possessed final authority regarding the Board's personnel and discipline decisions.[11]

11. Defendants may, of course, offer evidence

at trial that Ellis did not, in fact, possess final

The Board's dress code policy was originally promulgated by Ellis' predecessor in office and provides that the ultimate penalty for code violations should be determined at a "departmental hearing" conducted, presumably, by the Director. Further, the progressive discipline policy created by the Camden County Board of Social Services states that "the decision making process surrounding the imposition of major disciplinary penalty will always be in consultation with the Director or his designate." (Def.Br., Ex. 2). While it is unclear from the record who was responsible for the original issuance of the discipline policy (it may well have been the Director), the policy does appear to place final authority in the hands of the Director by granting him ultimate authority over the decision-making process under the policy and by permitting him to avoid entirely the terms of the policy entirely in certain cases. (*Id.*) While it is true that an employee terminated pursuant to a "major disciplinary action" has a right to appeal to the New Jersey Board of Personnel, *see* N.J. Admin. Code tit. 4A, § 2–2.8 (2001), "minor" discipline (including, one imagines, discipline for dress code violations) is left to the policies of the Board and any "negotiated agreements" to which it is a party, *Id.* § 2–3.2.

Even if Ellis (or another policymaker) did not make all of the decisions regarding Plaintiff, municipal liability may still be appropriate if the Board's policymakers acquiesced in a "custom" which permitted retaliation against Plaintiff. *See Monell* at 690, 98 S.Ct. 2018. If it is found that the Defendants' custom of retaliation was so "permanent and well-settled" as to rise to the level of "a longstanding practice or custom which constitutes the 'standard

operating procedure' of the local government entity", municipal liability may be imposed. *Jett,* 491 U.S. at 737, 109 S.Ct. 2702. As mentioned, neither party has made much of an effort to discuss the factual or legal merits of the municipal liability issue and the factual record in this regard is extremely thin. Accordingly, summary judgment at this point would be premature.

### D.

Because Plaintiff has offered evidence sufficient to permit a conclusion that the disciplinary actions taken against her were in retaliation for her exercise of rights protected by the First Amendment, Defendants' motion for summary judgment on the § 1983 claims contained in Counts Two and Six of Plaintiff's Amended Complaint will be denied.

### V.

Related to Plaintiff's § 1983 claim is her claim that the adverse actions against her were taken in violation of the anti-retaliation provisions of the New Jersey Law Against Discrimination, N.J.S.A. 10:5–12(d).

The retaliation provision of the LAD states that it is an unlawful employment practice for "any person to take reprisals against any person because he has opposed any practices or acts forbidden under this act or because he has filed a complaint. . . ." *Id.* To state a claim for retaliation under this provision, a plaintiff must show that: (1) he or she engaged in protected conduct known to the defendant; (2) he or she was subjected to an adverse employment decision; and (3) there was a "causal link" between the protected activi-

---

policymaking authority. Likewise, Plaintiff may offer evidence that another of the Defendants possessed final authority in one of the

areas at issue. At this stage, however, the evidence points to Ellis and therefore summary judgment on this issue is not warranted.

ty and the adverse decision. *Shepherd v. Hunterdon Developmental Center,* 336 N.J.Super. 395, 765 A.2d 217 (2001); *Romano v. Brown & Williamson Tobacco Corp.,* 284 N.J.Super. 543, 665 A.2d 1139 (1995). *See also, Ferraro v. Bell Atlantic Co., Inc.,* 2 F.Supp.2d 577 (D.N.J.1998); *Lombardi v. Cosgrove,* 7 F.Supp.2d 481, 498 (D.N.J.1997). Once these factors are established, the burden shifts to the defendant to articulate a "legitimate, non-retaliatory reason for the action." *Shepherd,* 765 A.2d 217, 230. If such a reason is offered (and it usually is, as the defendant's burden at this stage is "relatively light"), the Plaintiff must then demonstrate that a retaliatory intent motivated the defendants. *Id.* This can be done either "directly" by showing that a discriminatory reason more likely than not motivated the decision or "indirectly" through evidence that the proffered reason is pretextual. *Id.*

As this Court has noted, this burden-shifting approach is virtually identical to that employed for federal claims under Title VII. *Ferraro,* 2 F.Supp.2d at 587 (noting that the analytical framework of Title VII and the burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668, apply to retaliation claims under the LAD). *See also, Farrell v. Planters Lifesavers Co.,* 206 F.3d at 279; *Kachmar,* 109 F.3d at 177; *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 500 (3d Cir.1997); *Grigoletti v. Ortho Pharmaceutical Corp.,* 118 N.J. 89, 570 A.2d 903, 906–907 (1990) ("In outlining approaches and infusing discrimination claims under the LAD with substantive content, we have adopted the Supreme Court's analysis of unlawful discrimination claims brought under Title VII of the Civil Rights Act of 1964.").

There is no question that Plaintiff has satisfied the first two elements of her claim. First, the conduct alleged by Marrero, if proven, violated the Law Against Discrimination. In *Drinkwater v. Union Carbide Corp.,* the Third Circuit recognized that it is the plaintiff's belief, not the merits of her claim, that determines whether an employee's conduct is protected. 904 F.2d 853, 866 (3d Cir.1990) (dismissing LAD discrimination claim, but allowing retaliation claim on the basis that "UC is not free to retaliate against plaintiff simply because she has failed to build her sex discrimination claim properly.").

Second, although the definition of "adverse employment action" under the LAD and Title VII differs from the broader definition applicable to First Amendment claims, it is clear that Plaintiff's discharge satisfies the adversity requirement. In order to constitute "adverse employment action" for the purposes of the LAD, "retaliatory conduct must affect adversely the terms, conditions, or privileges of the plaintiff's employment or limit, segregate or classify the plaintiff in a way which would tend to deprive her of employment opportunities or otherwise affect her status as an employee." *Hurley v. Atlantic City Police Department,* 1998 WL 351781, No. CIV. A. 96–4928(JEI), at *12 (D.N.J. May 28, 1998). *See also Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997) ("Retaliation must be serious and tangible enough to alter an employee's compensation, terms, conditions or privileges of employment ... [to] constitute adverse employment action."). While termination is the most obvious example of adverse employment action, "less flagrant reprisals by employers may ... be adverse." *Hurley,* 1998 WL 351781, at *12 (quoting *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997)). *See also, Shepherd* 765 A.2d at 230 ("In some situations, it is possible for retaliatory harassment to amount to adverse employ-

ment action."). In this case, Plaintiff's dress code-related allegations go beyond mild harassment of the kind at issue in *Shepherd* and involve tangible employment actions which cost her several days pay and, if her testimony is believed, lead to her being forced to take a month's unpaid sick leave. Thus, the Defendants' conduct in disciplining Plaintiff for her alleged dress code violations is, taking Plaintiff's allegations in the light most favorable to her, also sufficiently adverse to satisfy the second element of a cause of action for retaliation under the LAD.

As to the causation element, Defendants correctly point out that the Third Circuit has stated that "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse v. American Sterilizer*, 126 F.3d 494, 503 (3d Cir.1997) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997)). This statement does not, however, establish the proposition, asserted by Defendants, that "timing alone is insufficient to demonstrate causation." In *Krouse*, the Court went on to note that timing alone, while not always sufficient to establish causation, may do so where the timing of an employer's retaliation is "unusually suggestive" of retaliatory motive. *Krouse*, 126 F.3d 494, 503 (rejecting claim because 19 months had passed between plaintiff's EEOC complaint and discharge). *See also, Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir.1989) (holding that discharge of Plaintiff two days after receipt of notice of EEOC complaint established causal connection for purposes of defeating summary judgment).

While the timeline evidence in this case may, in fact, be "unusually suggestive" of a retaliatory motive, such a finding need not be made, as "case law has clearly allowed a plaintiff to substantiate a causal connection for purposes of the prima facie case through other types of circumstantial evidence." *Farrell*, 206 F.3d at 281. As the Court in *Farrell* noted, the "it is causation, not temporal proximity or evidence of antagonism that is an element of plaintiff's ... case." *Id.*

While Defendants quote the language above to support their contentions, the fact is that *Kachmar* and *Farrell* made it easier, not more difficult, for a plaintiff to satisfy the causation requirement of a statutory retaliation claim. In deciding the issue of causation, a court must examine all of the evidence offered by a party, not just those pieces that relate to temporal proximity or patterns of antagonism. As the Third Circuit noted in *Andrews v. City of Philadelphia*, "a play cannot be understood on the basis of some of its scenes, but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." 895 F.2d 1469, 1484 (3d Cir.1990). That said, the evidence in this case, as discussed above, is sufficient, even under the more stringent Title VII / LAD causation analysis, to permit an inference of a retaliatory motive on the part of Defendants.

With Plaintiff's *prima facie* case established, the burden shifts to the Defendants to offer a legitimate, non-retaliatory explanation for their actions. Once such a reason is offered, the Plaintiff must then show that the offered reasons are pretextual.

■ The Board contends that it simply enforced its "long-standing" dress code policy against Plaintiff and then fired her for violating its statutorily-authorized excessive absence policy. (Def. Br. at 14, 19). This statement is sufficient, as Plaintiff recognizes, to satisfy the Defendants' burden under *McDonnell Douglas*. Accordingly, Plaintiff must submit evidence

that either 1) "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a fact finder could reasonably conclude that each reason was fabrication"; or 2) "allows the fact finder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1067 (3d Cir.1996) (citing *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir.1994)).

Under *Fuentes*, a plaintiff's evidence casts sufficient doubt on a defendant's articulated justifications where it demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." 32 F.3d at 765 (internal quotation omitted). While the inconsistency of the Board's enforcement of its own internal policies might create some question as to the veracity of its proffered reasons [12], the issue need not be discussed in depth, as Plaintiff's evidence possesses enough probative force on its own to allow a reasonable factfinder to conclude that

Defendants' motivations were discriminatory. Thus, Plaintiff has satisfied the demands of the second prong of the *Fuentes* analysis.

Fuentes' second prong is met where a plaintiff "point[s] to evidence that proves ... discrimination in the same way that critical facts are generally proved-based solely on the natural probative force of the evidence." *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1111 (3d Cir. 1997). As mentioned above, Plaintiff has offered direct evidence of Defendants' animosity towards her and the pattern of antagonism that appears to have resulted from it, and has demonstrated a number of temporal relationships that would allow a jury to connect that animosity and antagonism to her protected conduct. This evidence, which was sufficient to allow a conclusion that Plaintiff's protected speech might have been a substantial or motivating factor in Defendants' decisions, is also sufficient to permit a reasonable jury to conclude that Defendants' discriminatory motives were a motivating or determinative cause of their actions and that their asserted nondiscriminatory justifications are pretextual.[13]

---

**12.** In *Fuentes*, the Court noted that "a decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory or weak." 32 F.3d at 765. Here, the fact that Defendants seem to have regarded its dress code policy as dead letter, except in Plaintiff's case, raises some questions about its claims of neutral enforcement. On its face, the dress code is quite vague and does not specifically address many items of clothing, including those Plaintiff wore on the days in question. It seems a reasonable inference from the facts that where a policy gives significant discretion to an employer, and where that policy is rarely, if ever, enforced, its ultimate enforcement against an individual whose conduct appears to be no different from many of her co-workers might be pretextual.

**13.** Although the second *Fuentes* prong basically relies on the same evidence used to establish the plaintiff's prima facie case, The Third Circuit has recognized, on numerous occasions and "almost in passing", that "nothing about the *McDonnell Douglas* formula requires [a court] to ration the evidence between one stage or the other." *Farrell* at 286. *See also, Iadimarco v. Runyon*, 190 F.3d 151, 164 (3d Cir.1999); *Jalil*, 873 F.2d at 709, n. 6 ("the McDonnell Douglas formula does not compartmentalize the evidence so as to limit its use to only one phase of the case."). Indeed, the Court in *Farrell* concluded by stating that "we will not limit the kinds of evidence that can be probative of a causal link any more than the courts have limited the type of evidence that can be used to demonstrate pretext." *Id.*

Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's LAD retaliations claims (contained in Counts Two and Six of the Amended Complaint) is denied.

## VI.

Plaintiff claims "gender-based discrimination as a result of the application of the dress code policy pre-dating plaintiff's termination."[14] (Pl. Br. at 39). Under the LAD, an employer may not discriminate on the basis of sex in the "terms, conditions or privileges of employment". N.J.S.A. 10:5–12(a) (West Supp.2001). Since Plaintiff alleges that Defendants' asserted justifications are pretext, her claim should be analyzed under the burden-shifting approach of *McDonnell Douglas* and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253 & n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Assuming that Plaintiff has satisfied the elements of her *prima facie* case and that Defendants have articulated a non-discriminatory basis for their actions, the inquiry becomes whether the evidence would allow a fact finder to conclude that "but for" Plaintiff's gender, adverse action would not have been taken. *Fuentes,* 32 F.3d at 764 (citing *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). Because Plaintiff's evidence cannot support an inference that she was disciplined under the dress code policy because she is a woman, summary judgment is appropriate.

▮ As the Third Circuit has stated, the heart of any discrimination claim is "always whether the employer is treating some people less favorably than others because of their race, color, religion, sex or national origin." *Pivirotto v. Innovative Systems, Inc.,* 191 F.3d 344, 352 (3d Cir. 1999) (quoting *International Bhd. Of Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). Here, while Plaintiff has demonstrated that she was treated less favorably than others, there is virtually no evidence that this had anything to do with the fact that she is a woman.

Plaintiff states that "the problem with the defendants' dress code is that it's too subjective and not fairly applied across the board." (Pl. Br. at 40). While this may in fact be true, the unfair application of an employer's policy does not rise to the level of actionable gender discrimination unless that unfairness is related to gender. *See, e.g., Bellisimo v. Westinghouse Electric Corp.,* 764 F.3d 175, 181 (3d Cir.1985) ("Dress codes are permissible under Title VII as long as they . . . are enforced evenhandedly between men and women. . . ."). In this case there is simply no evidence that Defendants discipline of Plaintiff was related to her sex.

The same evidence upon which Plaintiff relies for her retaliation claims, that other women dressed "virtually the same" yet were not disciplined (Pl. Br. at 36), undermines her contention that gender was a motivating factor in Defendants' decisionmaking. While Plaintiff cites the deposition testimony of several of her female coworkers as evidence for her claims, a review of this testimony reveals that the primary objections of Plaintiff and her coworkers were that Plaintiff alone, and no one else, male or female, was targeted for

---

14. As Defendants point out, Plaintiff's claims in this area are unclear. In her Amended Complaint, Plaintiff claimed that she was "forced to work in a hostile work environment based upon her sex and based upon sexual harassment." (Am. Compl. at 6). However, in opposing summary judgment, Plaintiff states explicitly that "a hostile work environment based upon sexual harassment is not asserted." (Pl. Br. at 39). Accordingly, Plaintiff's claim will be analyzed solely as one alleging disparate treatment.

enforcement of the dress code. (See 1/15/98 Pl. Ltr. To Dir. Ellis; Walker Rice Dep. at 12; Tazewell Dep. at 76:23–35).

Much of the evidence provided by Plaintiff focuses on the fact that most of the Board's own discussions of the dress code policy focused on the policy for women while ignoring the issue of men's attire. This evidence, without more, does little to bolster Plaintiff's case. As noted in *Bellissimo* (the only case that Plaintiff cites to support her position), dress code standards may differ for men and women without violating Title VII. 764 F.2d at 181. Given that, as Plaintiff's witnesses testified, women's fashions seem to change much more rapidly than men's, very little can be concluded about Defendants' motivations from the fact that the dress code committee paid more attention to women's clothing than to men's when revising their policy.

Finally, it should be noted that the evidence in this case does indicate that the dress code was, on occasion, enforced against male employees. As noted by the Third Circuit, because "Title VII [and the LAD] prohibit only discrimination ... consideration of the practices of an employer toward the plaintiff must be evaluated in light of its practices toward the allegedly more favored group, in this case males." *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 527 (3d Cir.1992). Although such evidence is scant as it is clear that enforcement of the policy was rarity for both men and women, Clement Carney stated that he could recall two instances of dress code enforcement against employees other than Plaintiff: one involving Craig Lucas, a male employee, and one against a female employee named Tally. (Carney Dep. at 67). While this evidence, on its own, does not carry much weight, it is simply a further indication that Plaintiff has not met her burden

of demonstrating that gender was a motivating factor in the Defendants' decisions.

As a number of courts have recognized, an employer has a valid interest in regulating the image that its employees present to the public. *See Bellissimo,* at 181; *Fagan v. National Cash Register Co.,* 481 F.2d 1115, 1124–25 (D.C.Cir.1973) ("We may take judicial notice of an employer's proper desire to achieve favorable acceptance [of its public image]."). While an employer certainly may not treat women less favorably than men through its dress policies, and while the selective enforcement of such policies against a single employee may be unlawful in certain cases (such as where retaliation is involved), the mere fact that an employer's policy is enforced against a single female employee does not, without more evidence of causation than has been shown here, create a genuine issue of material fact sufficient to survive summary judgment. As the New Jersey Supreme Court has held, "common sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's sex." *Lehmann v. Toys 'R' Us, Inc.,* 132 N.J. 587, 604, 626 A.2d 445 (1993). Because Plaintiff has not met her burden of showing that there is an issue of material fact relating to whether she was targeted by Defendants for discipline because of her gender, summary judgment as to Plaintiff's gender discrimination claims (contained in Count One of the Amended Complaint) will be granted.

## VII.

The final claim that must be addressed is that Defendants committed the torts of intentional interference with prospective economic advantage and intentional infliction of emotional distress.

### A.

Under New Jersey law, it is a "fundamental" element of a claim for intentional interference with prospective economic advantage that the claim be directed against defendants who are not parties to the underlying contractual or economic relationship. *Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 563 A.2d 31 37 (1989). Therefore, as to the Board of Social Services itself, because it is clearly a party to the employment relationship with its employees, Plaintiff's claim is barred.

Defendants argue that because Defendants Ellis, Carney and Mayers were employees of the Board, Plaintiff's claims against them must be similarly dismissed. Although the Court agrees with this ultimate conclusion, the analysis is somewhat more complex than Defendants suggest. As the *Printing Mart–Morristown* Court noted, "the fact that an independent cause of action for tortious interference cannot exist against [an employer] does not answer the question of whether employees ... can be held liable for tortious interference with a relationship ... to which [their employer] was a party." 563 A.2d at 42. The difficulty, the Court noted, is that while employees are generally not immune from tort liability simply because they were acting on behalf of their employer at the time of the alleged tort, such employees do possess tort immunity where they are "exercising a privilege of the principal". 563 A.2d at 42–43. *See also, Hurley v. Atlantic City Police Department*, 1995 WL 854478, at *14 (D.N.J. Aug.4, 1995)(discussing *Printing Mart–Morristown* ). As the courts of this Circuit, including this one, have recognized, only when an employee asserts that a supervisor was acting "outside the scope of his employment and/or for his own personal gain" may the employee go forward with

a claim for tortious interference. *Horvath v. Rimtec Corporation*, 102 F.Supp.2d 219, 236 (D.N.J.2000) (citing *DeJoy v. Comcast Cable Comm., Inc.*, 941 F.Supp. 468, 478 (D.N.J.1996)). *See also, Emerson Radio Corp. v. Orion Sales*, 253 F.3d 159, 173 (3d Cir.2001) ("Acts committed by an agent outside the scope of employment or agency may satisfy the 'tripartite relationship' required for a tortious interference claim."); *Varrallo v. Hammond Incorporated*, 94 F.3d 842, 849 n. 11 (3d Cir.1996) ("An employee who acts for personal motives, out of malice, beyond his authority, or otherwise not 'in good faith in the corporate interest' falls outside the scope of the privilege."); *F.D.I.C. v. Bathgate*, 27 F.3d 850, 875 (3d Cir.1994); *Fioriglio v. City of Atlantic City*, 996 F.Supp. 379, 392 (D.N.J. 1998); *Obendorfer v. Gitano Group, Inc.*, 838 F.Supp. 950, 956 (D.N.J.1993). Accordingly, the issue that must be decided is whether the Defendants were acting outside the scope of their employment when they disciplined, and later discharged, Plaintiff.

Plaintiff has made no specific allegations that Defendants were, at any time, acting outside the scope of their employment or for their own personal gain. Although Defendants were allegedly moved by a retaliatory motive in discharging Plaintiff, they were certainly within the scope of their respective positions when they acted. Defendants were clearly exercising the official authority delegated to them by the regulations and policies of the Board, the County and the State of New Jersey when they initiated and conducted formal disciplinary proceedings against Plaintiff. The fact that they were acting with an allegedly improper motive does not remove their actions from the scope of their employment. *See Emerson*, 253 F.3d at 174 (alleged bad faith conduct of corporate officer was within scope of employ-

ment); *Fioriglio,* 996 F.Supp. at 392–393 (alleged retaliation not outside scope of employment); *Obendorfer,* 838 F.Supp. at 956 (holding that alleged harassment was within scope of employment).

Furthermore, as this Court noted in *Hurley* and *Fioriglio,* the New Jersey Supreme Court in *Printing Mart–Morristown* seemed to believe that a new cause of action would be required in order for a plaintiff to proceed with a tortious interference claim against a party's employee. *Fioriglio,* at 393; *Hurley,* at *13–14. Such a cause of action has not since been created and "it is not the role of this court to create new actions under New Jersey law." *Fioriglio* at 393 (citing *Bathgate,* 27 F.3d at 876). Thus, since Defendants Ellis, Carney and Mayers were acting within the scope of their employment at all times relevant to this case, Plaintiff's claims against them for tortious interference with prospective economic advantage are barred and summary judgment will be granted.

**B.**

▮ In addition, Plaintiff alleges that Defendants' actions constituted intentional infliction of emotional distress. To prevail on such a claim, Plaintiff must prove conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and intolerable in a civilized society." *Buckley v. Trenton Saving Fund Soc.,* 111 N.J. 355, 365–66, 544 A.2d 857 (1988) (adopting Restatement (Second) of Torts). Because Plaintiff has not alleged conduct that, if proven, would rise to that level, summary judgment on this claim is proper.

It has been noted that "the limited scope of this tort tolerates many kinds of unjust, unfair and unkind conduct." *Fregara v. Jet Aviation Business Jets,* 764 F.Supp.

940, 956 (D.N.J.1991) (citation omitted). Indeed, the Third Circuit has articulated the general principle that it is "extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988).

▮ Plaintiff's claim (one imagines, as she does not address the merits of this issue in her response) is that the Defendants' retaliatory conduct, combined with what she describes as a pattern of harassment, constituted extreme and outrageous behavior. However, the mere fact that the Defendants acted for an improper purpose does not give rise to an actionable claim. *See* Restatement (Second) of Torts, § 46, comment d ("It is not enough that the defendant acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice' . . . .").

The courts of this District have recognized that allegations of sexual harassment, discrimination, or improperly motivated discharge, cannot alone provide the basis for an intentional infliction of emotional distress claim. *Horvath v. Rimtec Corp.,* 2000 WL 1030357, No. CIV. A. 99–670(JEI), at *8 (D.N.J. July 19, 2000); *Ferraro v. Bell Atlantic Co., Inc.,* 2 F.Supp.2d 577, 589 (D.N.J.1998); *Borecki v. Eastern Int'l Management Corp.,* 694 F.Supp. 47, 62 (D.N.J.1988). Thus, to prevail on a claim for intentional infliction of emotional distress, a plaintiff must show that a number of factors operated to create an intolerable working environment. While Plaintiff has attempted to do this, alleging gender discrimination, sexual harassment and retaliatory discharge, given her failure to demonstrate intentional

discrimination and her express assertions that she is not claiming sexual harassment (she alleges very few specific instances of harassing conduct in any case), her allegations of retaliation and animosity are not enough.

A comparison of this case with others that have been decided by this Court and others in New Jersey and the Third Circuit reveals the shortcomings of Plaintiff's claim. For instance, in *Ferraro,* this Court found that plaintiff's claims of sexual harassment, discrimination, name-calling and physical intimidation did not establish a claim for intentional infliction of emotional distress. 2 F.Supp.2d at 589. In so ruling, it was noted that while the plaintiff was treated in a "rude", "unprofessional" and "unacceptable" manner, she nevertheless did not have a valid claim as such conduct "does not rise to the level of outrageousness necessary." *Id.* Similarly, in *Hurley v. Atlantic City Police Dep't.,* the Court determined that sexual harassment of the plaintiff by her supervisors and retaliation against her for the filing of complaints was not "extreme and outrageous", even where these actions contributed to a "very vicious" and "dangerous" workplace. 1995 WL 854478, No. CIV. A. 930260(JEI), CIV. A. 94–1122(JEI), at * 12 (D.N.J. Aug. 4, 1995). In *Hurley,* it was noted that "petty vindictive behavior" (which appropriately describes the behavior Plaintiff has alleged in this case) cannot support an intentional infliction of emotional distress claim. *Id.* (citing *Zamboni v. Stamler,* 847 F.2d 73, 80 (3d Cir.1988)). *See also, Mosley v. Delaware River Port Authority,* 2000 WL 1534743, No. CIV. 99–4147(JBS) (D.N.J. Aug. 7, 2000) (falsification of information by supervisor in order to get plaintiff fired insufficient to support claim); *Fregara,* 764 F.Supp. at 956 (intentional interference claim dismissed where plaintiff threatened with discharge, asked to resign, overworked, required to attend counseling sessions, told he was not doing a good job, given warning notices and closely monitored); *Aquino v. Sommer Maid Creamery, Inc.,* 657 F.Supp. 208, 211 (E.D.Pa.1987) (plaintiff did not state valid claim despite harassment, beratement and oversupervision of female employee, along with male supervisor following her into women's bathroom).

In contrast to these cases (and Plaintiff's case) stands the New Jersey Supreme Court's recent decision in *Taylor v. Metzger,* 152 N.J. 490, 706 A.2d 685 (1998), a case which illustrates the level to which an employer's conduct must rise in order to give rise to an intentional infliction of emotional distress claim. In *Taylor,* the New Jersey Supreme Court permitted a claim of intentional infliction of emotional distress where the plaintiff's supervisor referred to her as a "jungle bunny" in front of the Sheriff of Burlington County, who said nothing. In reaching its decision, the Court noted that "the defendant's remark had an unambiguously demeaning racial message that a rational factfinder could conclude was sufficiently severe to contribute materially to the creation of a hostile work environment." *Id.* at 691. In this case, Plaintiff has not demonstrated that a hostile work environment existed, indeed, she has explicitly denied that she is asserting such a claim. In addition, while the comment uttered in *Taylor* was "patently a racist slur, and [was] ugly, stark and raw in its opprobrious connotation," *id.,* Defendants conduct here is, if anything, more akin to the "adolescent antics" in *Hurley* than to the such terrible epithets. Accordingly, Defendant's motion for summary judgment as to Plaintiff's claim for intentional infliction of emotional distress will be granted.

## VIII.

For the reasons set forth above, Defendants' motion for summary judgment is

granted in part and denied in part. The Court will issue an appropriate order.